The appellant, Thomas Carl Johnson, was found guilty of capital murder by a jury on November 19, 1982, and sentenced to imprisonment in the penitentiary for a term of life without parole. From this verdict and sentence, the appellant has appealed. After considering the transcript and briefs, we find no error prejudicially sufficient to warrant a reversal, and the trial court's decision is due to be affirmed.
On Sunday, July 11, 1982, Michael Long, a Birmingham policeman, was working as a security officer for the Sandpiper Apartments on Valley Avenue in Birmingham. The manager requested him to check on Bobby Anderton, who occupied 737-K Barcelona Court in the complex.
After Long and the maintenance man unlocked the apartment door, Officer Long, from experience, recognized the sick, sweet odor of a decomposing body. He walked down the hall and observed in the living room a quilt spread on the floor. He saw the bottom parts of legs protruding from the quilt. The quilt looked like it was made up perfect, like a bed, with no wrinkles. The body under the quilt was that of Bobby Anderton.
Blood was on the walls, the couch, a pillow on the couch, and on the back of the couch. The appellant's glasses were lying on the back of the sofa. Other than the bed being unmade, the apartment appeared fairly neat, and there was no evidence of forced entry.
The victim's body had received 33 wounds to the head, neck, and torso. These wounds were consistent with having been inflicted by an ax or hatchet. The majority of the wounds had been inflicted while the body was in a prone position. The multiple incised wounds were the cause of the victim's death.
There were no defensive-type wounds on the body. This indicated that it was unlikely that the deceased had engaged in a struggle before being chopped to death. The pathologist's opinion was that the victim had been dead somewhere from thirty-six to approximately sixty hours prior to the discovery of his body.
The victim was last seen alive by witnesses other than the appellant on July 9, 1982, at 7:00 a.m. That was at the end of his shift at the University of Alabama Hospital.
On Sunday, July 11, 1982, at approximately 4:20 p.m., the appellant, Thomas Carl Johnson, was arrested on the premises of Tanglewood Park, North Carolina. He was arrested by a park ranger, who also was a deputy sheriff with the power to arrest. The ranger charged him with "trespass after warning" for being on the park property.
Prior to arresting the appellant, the ranger checked with his superior officer who told him that the appellant had been warned to stay off the park property. When the ranger first saw the appellant, he was sitting in the victim's automobile. After the ranger frisked the appellant, he took the car keys from the appellant. Other officers arrived and carried the appellant to jail.
After a wrecker came, the ranger, acting under standard procedure, began to inventory items in the car. This procedure was followed so that the towing service could later account for anything in the car. During the inventory process, the ranger noticed a handle sticking out from underneath the driver's seat. After further examination, he saw that it was a hatchet handle and that the hatchet had blood on it.
The ranger called the Forsythe County, North Carolina Sheriff's Office. After Detective Evelyn Harles arrived, the inventory was completed. In addition to the hatchet, credit card receipts bearing the victim's name, a backpack in which were the victim's car registration and tag receipt, some seed, a quantity of green material in a film container, a stone pipe containing charred or partially burned vegetable *Page 1380 
material, and a "roach clip" were found in the car.
While inventorying the appellant's personal property on appellant's person at the jail, Mark Little, a deputy sheriff, discovered a Chevron credit card issued to the victim in the appellant's wallet. After the appellant was placed in jail on the trespass charge, Deputy Little arrested the appellant for "marijuana and paraphernalia possession."
The appellant was given the Miranda warnings by Deputy Mark Little in the jail. He made a voluntary statement. In the statement he said he had seen Bobby Anderton the day before in Charlotte, North Carolina, and that Anderton had loaned him the car. He said there was no hatchet in the car. When asked about blood on the hatchet, he again said there was no hatchet.
The appellant had told Fred Borgman, a co-worker at some stables in Tanglewood Park, that he was going to Birmingham to buy a small car from a "brother" who lived in Birmingham. (The term "brother" was used by appellant to mean "friend.") He told Borgman he did not have much money at all.
About a day and half later, between 7:00 a.m. and 10:00 a.m., Borgman received a phone call from the appellant. The appellant told Borgman he was at his "brother's" house in Birmingham and would be coming back in a couple of days. Borgman received another call from the appellant around 2:00 p.m. in which the appellant told him he was in Atlanta and was coming back to North Carolina.
The next day, Saturday, between 10:30 a.m. and noon, the appellant showed up at Borgman's residence in Advance, North Carolina. Later at a Chevron station, while purchasing gas and using a Chevron credit card, the appellant told Borgman, "Watch this forgery." The appellant also showed Borgman a hatchet in the car.
They drank liquor, shot pool, and slept that night in the car. The next morning, Sunday, the appellant took Borgman home.
Three Birmingham police officers went to North Carolina and interviewed the appellant. He gave a voluntary statement in which he said he borrowed bus fare, caught a bus in Winston-Salem, and arrived about 5:30 a.m. on July 9, 1982. He said he had the hatchet in his backpack and that he "had a pretty long hoof up against him." He said he had previously lived in Anderton's apartment with him. He further said they (he and Anderton) got into an argument over money; that he appellant, "just kinda flipped out;" that Anderton tried to raise a hand and that he picked up the hatchet from his bag by the side of his chair and struck Anderton in his back, head, and neck with it. He further said that he then covered Anderton with the blanket, washed blood off himself, took Anderton's watch and wallet, and left in Anderton's car. He further said that before he was arrested, he had washed the blood from the clothes he was wearing when he killed Anderton.
The appellant raises twelve issues as errors, and they are considered as follows:
 I.
The appellant contends that the State failed to prove its prima facie case as to the capital offense of murder in the course of committing a robbery in the first degree. The State had the burden of proving beyond a reasonable doubt that the appellant killed the victim during a robbery in the first degree. § 13A-5-40 (a)(2), Code of Alabama 1975. Absent that proof, he could be convicted of a crime carrying no greater punishment than murder under § 13A-6-2, Code of Alabama 1975.
Code of Alabama 1975, § 13A-5-39 (2), defines "during" as follows:
 ". . . in the course of or in connection with the commission of or in immediate flight from the commission of the underlying felony or attempt thereof."
Even had the appellant killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the *Page 1381 
property formed a continuous chain of events. Clark v. State,451 So.2d 368 (Ala.Cr.App. 1984), cites Cobern v. State,273 Ala. 547, 142 So.2d 869 (1962), holding that the fact that the victim was dead at the time of the taking of the property would not mitigate against the crime of robbery if the events of the intervening time between the murder and the time of taking of the property formed a continuous chain of events. The State proved robbery and murder of the victim in the course thereof beyond a reasonable doubt and to a moral certainty.
 II
The appellant contends that the State should have quashed the September 1982 indictment because the State failed to secure the court's permission to abandon the August 1982 indictment before reindictment. The August 1982 indictment accused the appellant of taking "one Chevron credit card, account number 122584656." The subsequent September 1982 indictment is identical except that it corrected the number to "122284656."
On November 15, 1982, the court entered the following order:
 "The indictment returned by the August Grand Jury number 87866 is hereby quashed. The court hereby approves of State's reindictment procedures with September, 1982 Session of Grand Jury."
It is true that Alabama Code, Title 15-8-130, says:
 "An indictment must not be quashed, dismissed, discontinued or abandoned without the permission of the court, and such permission must be entered of record."
However, it is the better practice to bring the second indictment before the first is quashed. Perkins v. State,66 Ala. 457, 461 (1880). The appellant's contention is without merit.
 III.
The appellant contends that the items seized during the inventory of the car after the appellant's arrest should not have been admitted into evidence. Now, for the first time, he contends that the State failed to prove the North Carolina statute on trespass after warning under which the appellant was initially arrested.
Only the grounds of objection presented to the trial court can serve as a basis for reversal, and even though the evidence may have been inadmissible on different grounds, the appellant is bound by the specified grounds of objection. Bolding v.State, 428 So.2d 187 (Ala.Cr.App. 1983).
 IV.
The appellant contends that the failure of the police officers to advise him that the crime he was about to be questioned about might carry the death penalty rendered his confession involuntary and inadmissible. To support this contention the appellant cites Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
This contention is not mandated by Miranda. The failure to advise a defendant of the possible range of sentences to be inflicted does not render a confession involuntary.
Appellant further contends that as a result of the illegality of the original detention, the statement should have been suppressed by the authority of Taylor v. Alabama, 457 U.S. 687,102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). However, should the initial detention of the appellant have been unlawful, when the second officer arrived and told the original deputy park ranger that the appellant had been warned to stay off the entire park premises, the deputy park ranger had probable cause to arrest the appellant for trespass after warning. There was no search, inventory, or questioning until the appellant was thus arrested. Hence, when the Birmingham police officers arrived, the appellant was in lawful custody on the North Carolina trespass charge. The intervening circumstances clearly established the probable cause, and they did not flow from the alleged illegal detention. *Page 1382 
 V.
The appellant contends that the court improperly allowed Mark Little to testify about a statement allegedly made by appellant after incarceration. He relies on the same grounds set out in III and IV, and the rulings made in those issues apply to this issue also.
 VI.
The appellant claims that the prosecutor, by calling the "deceased" his client, committed reversible error under the authority of Bezotte v. State, 358 So.2d 521 (Ala.Cr.App. 1978). The appellant did not raise this issue at trial and cannot raise it for the first time on appeal. Objections to portions of a prosecutor's arguments which fail to specify portions deemed improper are insufficient to preserve the question for review. Dollar v. State, 26 Ala. App. 361,159 So. 704 (1935).
 VII.
The appellant contends that the court erred in overruling his motion for mistrial on the grounds that a juror violated the sequestration order.
Section 12-16-9 (a), Code of Alabama 1975, states as follows:
 "If the accused and his counsel and also the prosecuting attorney, in any prosecution for a capital felony consent thereto in open court, the trial court in its discretion may permit the jury to separate during the pendency of the trial, whether the jury has retired or not. A separation so permitted shall not create a presumption of prejudice to that accused, but on the contrary, it shall be prima facie presumed that the accused was not prejudiced by the separation of the jury."
On the night of the first day of the trial, the juror in question, after being instructed not to talk with anyone about the case, was permitted to purchase a carton of cigarettes and go home and get his personal effects. No official was available to accompany him, and the trial judge, without permission from either side, granted the juror this permission.
The trial judge held a hearing at which the juror testified that prior to entering the store to buy the cigarettes, he took his juror badge off, and that nothing was said at the purchase other than the juror's ordering the cigarettes. He read nothing and did not listen to the radio during the trip to the motel. He stated, without rebuttal, that he received no information extraneous to the proceedings.
Where a jury was allowed to separate before being taken to the motel for the night between days of trial, it was incumbent upon the State to clearly show that no injury resulted from separation of the twelfth juror. Beauregard v. State,372 So.2d 37 (Ala.Cr.App.), cert. denied, Ex parte Beauregard,372 So.2d 44 (Ala. 1979). Prior to Title 12-16-9 (a) [previously AlabamaCode, 1940, Title 15-382 (1)] being amended by the Legislature in 1982, the provisions regarding jury sequestering applied to both capital and non-capital prosecutions.
When a jury separates without the defendant's consent, the State may defeat a motion for mistrial based on the separation by proving that no injury resulted from the separation.Chappelle v. State, 267 Ala. 37, 99 So.2d 431 (1957); Nelson v.State, 253 Ala. 246, 43 So.2d 892 (1949). The State clearly rebutted any presumption of prejudice to appellant by reason of the separation and the court did not err in overruling the motion for mistrial.
 VIII.
The appellant contends that before the trial began he objected to the manner in which the jury was struck, in that the court had not properly determined the alternates in accordance with § 12-16-100 (c), Code of Alabama 1975.
After each side had utilized its alloted 14 strikes, 14 persons remained on the jury list. The court informed the 14 remaining jurors that two of them would be selected as alternates at random after the court's *Page 1383 
oral charge. Then the court asked, "Will that be all right with you gentlemen?" There was no objection by the appellant.
The next day the appellant's counsel argued that subsection (c) of the statute was not properly carried out insofar as its requirement "that the last jurors struck shall be the alternates." The last two jurors struck the day before should have been the alternates.
A literal reading of the statute shows that alternate strikes would be made with the last two strikes being the undisclosed alternates. However, the striking stopped when there were fourteen names remaining. Had the defense counsel made a timely proper objection to the court's explanation of how the alternates would be selected, the court could have corrected its error. However, after the court informed the parties that the two alternates would be selected at random, the court asked, "Will that be all right with you gentlemen?" The appellant made no objection at that time, which would have been the proper time to object if he had had an objection. In Duncanv. State, 369 So.2d 885 (Ala.Cr.App. 1979), the court held that the appellant could not gamble on the outcome and then claim error.
 IX.
The appellant contends that the court erred in overruling his motion to exclude Dr. Brisse's testimony concerning blood stains on the wall. He claims there was no testimony identifying the marks as bloodstains. However, Officer Michael William Lang, without objection, testified about blood on the walls and everywhere else. This contention is without merit.
 X.
The appellant contends that in the absence of testimony showing that he was an alcohol and/or drug abuser, Dr. Callahan should have not been permitted to testify as to the effect of sodium amytol on alcohol and drug abusers. However, in response to the question, "Did you form an opinion as to whether Mr. Johnson had any history of alcohol abuse or drug abuse?" a defense psychiatrist responded, "He is a significant abuser of both, for some time."
Clearly this testimony allowed the question to Dr. Callahan to be answered by him.
 XI.
The appellant contends that the court erred in allowing Albert Cobb, the deputy ranger, to testify concerning what Officer Luther Shields allegedly said in the defendant's presence. He contends that the purported statement bore directly on the validity of his detention and also that Officer Shields was not present at trial for cross-examination. He contends that his right of confrontation of an adverse witness, pursuant to Article 1, Section 6, of the 1901 Alabama Constitution and the Sixth Amendment of the United States Constitution was violated.
Deputy Ranger Cobb testified at a suppression hearing that when he detained the appellant in the Tanglewood Park parking lot, he radioed for Officer Shields to come to the scene. When Officer Shields arrived at Cobb's vehicle, Shields and Cobb talked as they stood "right beside the driver's side" of Cobb's vehicle. The windows were down and the appellant was on the passenger's side of the car roughly three feet from the two officers. Cobb then told Shields that the appellant told him he had only been warned to stay away from the stables.
The prosecutor then asked, "What did he [Officer Shields] say at that time?" (This is the question to which the objection was interposed and overruled.) Cobb testified that Shields told him, "No, sir. This man has been warned to stay out of this park."
Prior to this testimony, Cobb had already testified that Shields had instructed him, "If I saw him [appellant] anywhere in the park to pick him up for trespassing." Since the answer objected to was made within earshot of the appellant, the answer was properly admitted. The other statement by Cobb concerning his order to pick *Page 1384 
up the appellant if he saw appellant anywhere in the park rules out the contention that the appellant was prejudiced by the trial court's ruling.
 XII.
The appellant contends that the trial court abused its discretion by allowing Sgt. Grubbs of the Birmingham Police Department to be excused from the sequestering of witnesses. He contends that the court, in Weatherford v. State, 369 So.2d 863
(Ala.Cr.App.), cert. denied, 369 So.2d 873 (Ala. 1979), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979), held that the defendant failed to state his reasons for opposing the witnesses' presence in the courtroom. He further contends that he gave his reason for opposing Grubbs's presence in the courtroom in that the State had ample time to prepare its case. Grubbs was not necessary to assist in the expert's testimony and he was to testify as to the defendant's statement, a pivotal part of the State's case. However, Sgt. Grubbs was the officer in charge of the investigation, had more opportunity to talk with witnesses than the prosecutor, and he was needed in the chain of introducing numerous items of evidence.
There was no showing by the appellant that the court abused its discretion after he stated his reasons, and reversible error cannot be predicated on the trial court's ruling.
There being no reversible error in the trial court below, the case is due to be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge WALTER G. BRIDGES, serving as a judge of this court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of this court.
AFFIRMED.
All the Judges concur.