Todd J. LOWERY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–1477.

Court of Appeals of Alaska.

Oct. 14, 1988.

Jan A. Rutherdale, Asst. Public Defender, Juneau, and Dana Fabe, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Todd J. Lowery was convicted, following a jury trial, of murder in the first degree. AS 11.41.100(a)(1). Judge Walter Carpeneti sentenced Lowery to fifty years' imprisonment with twenty years suspended.

Lowery was charged with murder for the killing of Ronald Ritter on March 14, 1984. At trial, Lowery defended on the ground that he had killed Ritter in self-defense.

## THE HONEY BUCKET INCIDENT

Lowery first argues that Judge Carpeneti erred in allowing evidence of an argument between Lowery and Dale Allen over Allen's failure to empty a "honey bucket." The state made the following offer of proof at a hearing which was held to determine the admissibility of the incident: at Bullwinkle's, approximately six hours before Ritter was shot, Lowery got into an argument with Dale Allen, who rented the cabin located on the same parcel of land as the Lowery house, over the emptying of the cabin's "honey bucket." According to the prosecutor, Allen would testify that Lowery wanted to step outside and settle the matter by engaging in a fist fight. Allen did not accept the challenge, telling Lowery that he, Allen, would prevail in a fight. Allen would also testify that when Lowery left, he had a chip on his shoulder.

The state asserted that the "honey bucket" incident was relevant to show that, on the night he shot Ritter, Lowery was filled with hostility. Judge Carpeneti accepted the state's argument and denied Lowery's motion for a protective order.

At trial, however, the state's evidence did not conform to its offer of proof. The evidence that came in at trial differed in the respect that Lowery did not challenge Allen to a fight. Instead, Allen testified that he was tired of hearing Lowery talk about the "honey bucket" and said that he would "stomp on him" if they "were to get in a hassle." After Allen said this, Lowery quieted down. Allen testified that Lowery still had a "radical attitude," meaning that he still wanted to fight.

■ Under Alaska Rule of Evidence 404(b), character evidence is generally inadmissible to prove that someone acted in conformity with that character trait. Prior bad acts, however, may be admissible if they are relevant to a material fact other than propensity and if the court decides that the evidence is more probative than prejudicial. *Lerchenstein v. State*, 697 P.2d 312, 315 (Alaska App.1985), *aff'd*, 726 P.2d 546 (Alaska 1986).

■ We conclude that if Judge Carpeneti erred in admitting the testimony concerning the "honey bucket" incident, then admission of this testimony was harmless error. The testimony regarding the "honey bucket" did not show that Lowery challenged Allen to engage in a physical confrontation. When asked whether anyone suggested settling the matter outside, Dale Allen responded, "No, not really." The evidence therefore did not show that Lowery was angered to the point where he would suggest engaging in physical violence. When Allen told Lowery to shut up or he would stomp on him, Lowery backed off and quieted down. The danger of unfair prejudice, therefore, seems to be minimal. There were several witnesses to the

circumstances directly surrounding the confrontation between Lowery and Ritter. It seems clear to us that the jury decided this case based on the testimony of those witnesses, rather than on this relatively innocuous incident which occurred several hours before the critical confrontation.[1]

## PRODUCTION OF DEFENSE INVESTIGATORS' REPORTS

Lowery next argues that Judge Carpeneti erred in requiring him to provide defense investigators' reports of interviews with witnesses. Lowery argues that the disclosure violated the work-product privilege.

### A. McKINNEY TESTIMONY

Michael McKinney was an eyewitness to the shooting. On direct examination, he essentially testified that when Lowery shot Ritter, Lowery was not acting in self-defense. On cross-examination, defense sought to impeach McKinney's trial testimony with prior inconsistent statements which McKinney made to Thomas Edgeworth, an investigator hired by the defense. Through his questioning, Lowery's defense counsel suggested that McKinney had recently acquired a new perspective on the case after speaking with the Assistant District Attorney a week prior to trial.

Following this line of questioning, the prosecutor asked to see any written notes of McKinney's prior statements, citing Alaska Evidence Rule 613(b)(2). Lowery objected to disclosing his counsel's investigator's notes arguing that they were protected by the work-product privilege. Judge Carpeneti ruled that the work-product privilege had been waived with respect to the substance of McKinney's statements to Edgeworth when defense counsel questioned McKinney about those statements on cross-examination. Judge Carpeneti further ruled that if Lowery was concerned that something in the documents revealed his counsel's mental processes or strategy, the court would review the documents *in camera* and excise anything that would disclose defense strategy.

Defense counsel provided the documents to the court. After an *in camera* examination, Judge Carpeneti ordered all of the material to be turned over to the prosecutor, except for a cover page entitled, "Investigative Report By Thomas Edgeworth to Client [Defense Counsel] Ray Brown."

### B. GAINES' TESTIMONY

Daniel Gaines heard a gunshot and went to the Lowery house. On cross examination, defense counsel used a summary of Gaines' interview with Joseph Veres, an investigator hired by the defense, to refresh Gaines' recollection. Defense counsel also impeached Gaines with prior inconsistent statements he made to Veres.

At the end of Gaines' testimony, the prosecutor requested production of Veres' summary of the interview. As with Edgeworth's documents, defense counsel claimed that Veres' summary was protected from disclosure under the work-product privilege. Judge Carpeneti ruled that the situation was covered by Alaska Evidence Rule 612 because the summary was used to refresh Gaines' recollection. Judge Carpeneti examined the document *in camera* and excised a paragraph on the last page of the summary which was entitled "Comments."

■ The work-product privilege was recognized by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). It applies to both civil and criminal litigation.

At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the

---

1. Lowery also argues that the evidence should have been stricken because it did not correspond to the offer of proof. Lowery did not move to strike at trial. Therefore we review this error only under a plain error standard. In order to rise to the level of plain error, an error must be obvious and substantially prejudicial. *State v. Covington,* 711 P.2d 1183, 1184 (Alaska App.1985). As we have previously discussed, the testimony in question did not appear to be substantially prejudicial. We decline to find plain error.

realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*United States v. Nobles*, 422 U.S. 225, 238–39, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975).

The work-product privilege, however, may be waived. In *Nobles*, the Supreme Court held that when the defense called an investigator to testify as a witness, the work-product privilege was waived with respect to matters covered in his testimony. *Id.* at 239, 95 S.Ct. at 2170. Lowery points out that his case is distinguishable from *Nobles* because Lowery did not call the investigators to testify as witnesses. Alaska Rule of Evidence 613(b)(2), however, seems to provide that normally evidence concerning a prior statement is discoverable.

> In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, *but on request the same shall be shown or disclosed to opposing counsel.*

A.R.E. 613(b)(2) (emphasis added). It appears that other courts considering this issue have concluded that the work-product privilege is waived when an investigator's report is used to impeach a witness. In *People v. Small*, 631 P.2d 148, 159 (Colo.), *cert. denied*, 454 U.S. 1101, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981), the Colorado Supreme Court held that the work-product privilege of an investigator's report was waived when defense counsel used the report to impeach a witness and the witness admitted making the statement to the investigator. In *State v. Turner*, 97 N.M.

575, 642 P.2d 178, 185 (App.1982), *cert. quashed*, 98 N.M. 51, 644 P.2d 1040 (1982), the court held that the work-product privilege was waived when defense counsel impeached a witness with statements made to the defendant's former attorney. The disclosure was based on New Mexico Rule of Evidence 613(a) which is virtually identical to A.R.E. 613(b)(2).[2] In *United States v. Salsedo*, 607 F.2d 318, 320–21 (9th Cir. 1979), the court held that defense counsel's reference to a defense-prepared transcript during cross-examination waived any work-product privilege in relation to the transcript. Judge Carpeneti's finding of waiver based only on Lowery's use of the investigator's report to impeach McKinney and to refresh Gaines' recollection was correct. We find no error.

## JURY MISCONDUCT

Within three days after the jury returned its verdict, two jurors apparently had a change of heart and communicated to defense counsel their concern about the verdict. Based on the conversation with these jurors, Lowery moved for a new trial based on three types of juror misconduct: (1) breaking sequestration; (2) consuming alcoholic beverages; (3) conducting experiments. After a series of evidentiary hearings, Judge Carpeneti denied the motion, thoroughly explaining his decision in a written opinion. Lowery now argues that Judge Carpeneti erred in denying his motion for a new trial on the grounds that the jury broke sequestration and consumed alcoholic beverages.

The case went to the jury on the afternoon of August 1, 1984. The jurors were sequestered and stayed at a hotel until a verdict was reached on August 4. Two of the jurors met with defense counsel on August 6 to discuss their concern that some of the jurors had been allowed to leave the hotel to purchase some beer. Judge Carpeneti held an evidentiary hearing on August 9. At that hearing, three jurors testified that they had briefly sepa-

---

**2.** New Mexico Evidence Rule 613(a) states:

    (a) *Examining witness concerning prior statement.* In examining a witness concerning a prior statement made by him, whether

written or not, the statement need not be shown or its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.

rated from the rest of the jurors during the period of sequestration. One juror, J.Q., testified that while walking to the hotel after dinner on August 2, the bailiff, Butch Knightlinger, gave him and juror L.W. permission to enter a liquor store and purchase a bottle of Scotch. J.Q. testified that the only nonjuror that he spoke to was the store clerk and that nothing was said about the case. The state contends that J.Q. and L.W. were not gone very long based on juror M.C.'s testimony that J.Q. and L.W. had rejoined the group before they arrived at the hotel. Juror G.M. testified that after the jurors had returned to the hotel after dinner on August 2, the bailiff, Butch Knightlinger, gave him some money to purchase beer. G.M. left the hotel and went to a nearby liquor store where he purchased two six-packs of beer. He testified that he was gone only five minutes and that he did not talk to anyone about the case.

The jurors testified that during their sequestration they would begin deliberations about 9:00 a.m. and cease about 8:00 p.m. The jurors ordered lunch and had it delivered to the jury room. No alcohol was consumed during lunch or during deliberations. At 8:00 p.m., the jurors dined at a local restaurant. Jurors G.M., J.Q., P.N., C.F., D.M., M.C., and L.W. had alcoholic beverages with their dinners. The jurors had asked the bailiff whether they could consume alcohol at dinner and were told they could do so if they paid for it and did not deliberate after dinner. The jurors were under the impression that the bailiff had received permission from the judge. The bailiff had been ordered by the court, however, that the jurors were to abstain from the use of alcoholic beverages.

It took approximately one and one-half to two hours to eat dinner. According to the testimony, none of the jurors drank to excess on any of the three nights. After dinner, the jurors would retire to their rooms; there were no deliberations until the following morning.

All of the jurors except E.C. and N.S. testified that the alcohol had absolutely no effect on any of the jurors' abilities to deliberate in the morning. In contrast, E.C. and N.S. testified that their decision-making ability may have been affected. When asked if the use of alcohol affected her decision-making ability in the case, E.C. replied that she did not feel very well the following morning and she did not "know if it was the alcohol or the pressure." N.S. testified that she consumed one glass of wine with dinner on the night of August 1 and one-half glass with dinner on August 2. She first testified that the August 2 wine "might have" affected her decision-making ability, but when asked how it could have done so, she replied, "it would not have bothered my decision at that point." J.Q. testified that L.W. purchased a pint of Scotch and that both he and L.W. each drank one drink from the bottle on the nights of August 2 and 3. L.W. at first denied that he had consumed any liquor apart from dinner drinks, but then stated that J.Q. had purchased a fifth of Scotch, from which one drink was consumed each night. J.Q. testified that the bottle was three-quarters full when the jury went home on August 4 after returning their verdict.

C.M., who testified that he had separated to buy beer, testified that he had returned to the bailiff's room where he consumed three of the beers. C.M. indicated that no deliberations were conducted that night after he bought the beer.

Alaska Criminal Rule 27(e) provides in pertinent part:

(2) The jury shall be and remain under the charge of an officer of the court until they agree upon their verdict or are discharged by the court....

(3) Unless otherwise ordered by the court, the officer of the court having the jury under his charge shall keep the jurors together, and separate from other persons.

The leading Alaska case which deals with breaks in jury sequestration is *Kimoktoak v. State*, 578 P.2d 594 (Alaska 1978). In *Kimoktoak*, the trial judge excused the entire jury, over the objection of defense counsel, for the three-day Fourth of July weekend. Court rules required the jury to be sequestered unless both counsel stipu-

lated that the jury did not have to be sequestered. The supreme court held this violation of court rules to be *per se* reversible error, stating:

> We adopt this view because of the inherent difficulty in obtaining reliable information on whether there has been misconduct. "When there has been a prolonged separation, during which jurors moved about at will, affidavits or testimony of the jurors that they had not discussed the case or been guilty of other misconduct would be a mere formality, and not capable of refutation by the accused. To give such evidence effect as proof of absence of prejudice, against a helpless defendant, would be as illogical as to give the same effect to the presumption that the jurors had faithfully performed their duties."

*Id.* at 596 (quoting *People v. Werwee,* 112 Cal.App.2d 494, 246 P.2d 704, 706–07 (1952)).

In deciding *Kimoktoak,* the supreme court specifically pointed out that it was not deciding what rule it would apply where "the court required sequestration but separation occurred by the inadvertence or carelessness of the jurors or an officer of the court, or both." *Id.* at 596 n. 4. In referring to this issue, the supreme court cited as an example of a case in this area *People v. Martinez,* 45 Ill.App.3d 939, 4 Ill.Dec. 559, 561, 360 N.E.2d 495, 497 (1977). In *Martinez,* during jury deliberations, the deputy sheriff who was acting as bailiff allowed the jurors to leave his presence to move their cars from where they had been left earlier in the day to a guarded parking lot in the rear of the court building. At this time defense counsel encountered some of the jurors and exchanged greetings with them. *Id.* 4 Ill. Dec. at 560, 360 N.E.2d at 496. The *Martinez* court refused to apply the rule that any separation was *per se* reversible error, even though Illinois applied a *per se* rule where a trial judge permitted a jury to separate for an extended period of time. The *Martinez* court distinguished the former case which applied the *per se* rule on the ground that the trial judge in *Martinez* had not permitted the jury to separate and

return home during the course of the deliberations. The *Martinez* court pointed out that in *Martinez* it was the deputy sheriff who allowed the jurors to separate briefly. The *Martinez* court held that where the separation of the jury was caused by the jurors or the bailiff or both, the verdict would not be set aside unless the defendant could clearly show that the jurors were operated on in some way to the defendant's prejudice. *Id.* 4 Ill.Dec. at 561, 360 N.E.2d at 497.

In rejecting Lowery's motion for a new trial, Judge Carpeneti applied a standard, similar to that applied in *Martinez,* which placed a substantial burden on Lowery to prove that he had been deprived of a fair trial. The reasoning of *Kimoktoak,* however, would not seem to support placing the burden of proof on the defendant.

In *Kimoktoak,* the court held that where there was an unauthorized break in sequestration for an extended period of time that there was *per se* reversible error. The reasoning in *Kimoktoak* was that it is simply too difficult for a defendant to show whether or not there was impermissible contact with a juror. The court reasoned that it was unfair to expect a defendant to rely on testimony of jurors to show that there had been misconduct. Because the supreme court specifically did not resolve how it would handle a situation where the jurors briefly separated, we do not know how the court would treat that issue. The supreme court did cite to *Martinez,* a case which placed the burden of showing juror misconduct on the defendant.

■ It seems to us that the reasoning of the *Kimoktoak* case would support a holding that when the defendant has shown that there was a break in sequestration, the state should have the burden of showing that the jury was not improperly influenced. This would seem to lessen the difficulty, which the supreme court pointed out in *Kimoktoak,* of the defendant having to show juror misconduct through the testimony of the jurors themselves. Therefore, placing the burden of proof on the state to show that the jury was free from miscon-

duct appears to us to be a rule which is consistent with the reasoning of *Kimokt-oak.* We accordingly hold that this is the rule which the trial court should have applied to this case. We accordingly remand the case to Judge Carpeneti for reconsideration placing the burden of proof on the state.[3]

In analyzing this case, the parties have treated separately the issue of the jury breaking sequestration from the issue of the jury consuming intoxicating beverages. We believe that the two issues are sufficiently intertwined so that it is not sensible to treat these issues as separate in the context of this case. On this record, it appears that the major problem which was created by the jury breaking sequestration was the ability of the jury to obtain intoxicating beverages. The fact that sequestration was broken makes it difficult to tell how much alcohol was consumed and under what circumstances. Furthermore, the fact that a bailiff apparently violated direct orders of the court by permitting jurors to break sequestration to obtain intoxicating beverages and by allowing the jurors to consume intoxicating beverages places the entire course of the jury deliberations in this case under some suspicion. We therefore conclude that the issues of breaking jury sequestration and the jury consuming alcoholic beverages should be treated together.

Courts have normally been reluctant to allow litigants to attack jury deliberations. This reluctance is expressed in Alaska Evidence Rule 606(b) which provides as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon his or any other

juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

The Evidence Rule Commentary to 606(b) succinctly sets out the policy reasons behind 606(b):

The policy reasons underlying the exclusion of jurors' affidavits or testimony impeaching verdicts include protection of jurors against annoyance or embarrassment, freedom of deliberation, and finality of verdicts. Allowing inquiry into the mental operations and emotional reactions of jurors in reaching a given verdict would invite constant review as a result of tampering and harassment. Moreover, even without pressure by counsel or litigants, many jurors are likely to have second thoughts about their verdicts after they are excused by the Court and the influence of fellow jurors dissipates. Such second thoughts might cause jurors to question their verdicts if permitted to do so. Yet these policy reasons are not promoted by a blanket prohibition against inquiry into irregularities which occur in the jury process when such irregularities result from prejudicial extraneous information or influences injected into or brought to bear upon the deliberative process. If the judicial system is operating properly, such inquiries should rarely be necessary.

---

3. Lowery argues that we should apply a rule of *per se* reversibility even for brief separations. He cites *State v. West,* 11 Idaho 157, 81 P. 107 (1905), *State v. Church,* 7 S.D. 289, 64 N.W. 152 (1895), and *Daniel v. State,* 2 Am.Crim.Rep. 421 (Ga.1876) for this proposition. These cases, however, are all over eighty years old and do not represent the majority view. We find more persuasive the cases which presume that where the jurors have broken sequestration, there is a rebuttable presumption of prejudice. *See Johnson v. State,* 479 So.2d 1377, 1382 (Ala.Crim. App.1985) (state rebutted presumption of prejudice of case in which juror, who was allowed to go home to pick up some personal effects, testified that the only person he talked to was the store clerk and that he talked to the store clerk about purchasing cigarettes).

Failure to examine the relatively few cases that may arise would permit injustices to go uncorrected without reason.

■■■■ We are aware of the fact that many courts have interpreted rules similar to A.R.E. 606(b) very strictly in order to prevent litigants from conducting hearings to inquire into jury deliberations. The leading case in this area is *Tanner v. United States,* — U.S. —, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). In *Tanner,* the United States Supreme Court interpreted Federal Rule of Evidence 606(b), which is identical to A.R.E. 606(b). In a five-to-four decision, the Court held that the District Court did not err in refusing to hold an evidentiary hearing at which jurors would testify on juror alcohol and drug use during the trial. In *Tanner,* Tanner's attorney moved for a new trial based upon information from two jurors which indicated that the jury had consumed alcoholic beverages and drugs during the trial. *Tanner* is distinguishable from the present case. In *Tanner,* there was no evidence that the jurors had broken sequestration. The state does not seem to dispute the fact that where the defendant has established that there was a break in sequestration, it is proper for the court to inquire into the validity of the verdict under A.R.E. 606(b). We believe that the allegations of misconduct were sufficient to allow the inquiry which Judge Carpeneti made.[4] We conclude, therefore, that Judge Carpeneti did not abuse his discretion in conducting an evidentiary hearing concerning the jury deliberations in this case. In his written decision, however, Judge Carpeneti found that a bailiff violated specific directions from the court to keep the jury sequestered and to not allow the jurors to consume alcoholic beverages. Considering the fact that Judge Carpeneti found that

the defendant had established these violations, we conclude that he should have presumed prejudice to Lowery unless the state could rebut this presumption.

We accordingly AFFIRM in part and REMAND this case for Judge Carpeneti to apply this standard.

BRYNER, Chief Judge, dissenting.

I believe that the breaches in sequestration that occurred in the present case—particularly when considered together with the uncontroverted evidence of other impropriety by the jury and the bailiff—warrant application of the *per se* rule of reversal established in *Kimoktoak v. State,* 578 P.2d 594, 596 (Alaska 1978).

The right to a jury trial, a hallmark of our system of justice, is among the most basic protections afforded to the accused by our constitution. The *per se* rule of reversal adopted in *Kimoktoak* gives recognition to the paramount importance of assuring the integrity of the jury's verdict. *Kimoktoak* likewise recognizes the impracticality of adopting any rule other than one of *per se* reversal.

*Kimoktoak* does suggest that relaxation of the *per se* rule may be appropriate for breaches of sequestration in which brief separations by some jury members result from "inadvertence or carelessness." *Id.* at 596 n. 4. Implicit in this suggestion, however, is the notion that the *per se* rule of reversal should be relaxed only when the external circumstances surrounding a breach of sequestration assure that the breach was *de minimus* and had no effect on the jury's deliberations.

When the external circumstances of a breach do not in themselves provide assur-

---

**4.** Lowery argues that this court should reverse Judge Carpeneti's denial of his motion for a new trial because Lowery did not receive a full and fair inquiry into possible jury misconduct. He specifically objects to the fact that Judge Carpeneti questioned the jurors rather than permitting counsel to ask questions. Judge Carpeneti allowed counsel to submit written questions. He gave counsel the lunch recess in order to draw up the questions. Lowery now contends that the lunch recess was insufficient time to prepare questions. At the hearing, however,

Lowery did not request additional time to prepare questions. Moreover, during questioning of the jurors, both defense and the prosecutor were permitted to approach the bench and propose additional questions. The trial court has discretion to "regulate the manner in which evidence is to be obtained." *Elisovsky v. State,* 592 P.2d 1221, 1229 (Alaska 1979). Judge Carpeneti acted within his discretion in conducting the evidentiary hearing as he did. We believe that Lowery had a full and fair opportunity to participate in the hearing.

ance of a lack of prejudice, the only avenue available for determining prejudice becomes an inquiry into the deliberative process of the jury. The strong policy against delving into the internal deliberative process of a jury finds expression in Alaska Rule of Evidence 606(b), which provides, in relevant part:

> Upon an inquiry into the validity of a verdict ..., a juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict ... or concerning his mental processes in connection therewith....

In part, this rule reflects the strong need to protect the sanctity of jury verdicts; in part, it acknowledges the impossibility of determining the fairness of a verdict through the jury's own subjective assessment of the process by which the verdict was reached.

The same concerns were expressed by the Alaska Supreme Court in *Kimoktoak.* As *Kimoktoak* indicates, once a break in sequestration occurs, it is both unrealistic and fundamentally unfair to impose upon the accused the burden of attempting to establish prejudice through inquiry of individual jurors. *See, e.g., Kimoktoak,* 578 P.2d at 596. This unfairness may be somewhat mitigated, but is not cured, by shifting to the state the burden of disproving prejudice.

In the present case, the breaches in sequestration resulted neither from inadvertence nor from negligence. Rather, they stemmed from apparently knowing misconduct by a court official. While the breaches involved a limited number of jurors and were of short duration, it is undisputed that they enabled members of the jury to obtain and bring into the deliberative context substantial quantities of intoxicating liquor. Thus, despite the brevity of the separations and the limited number of jurors involved, the external circumstances surrounding the breaches do not provide assurance that they were *de minimus.* To attempt to assure the lack of prejudice, it became necessary to delve into the jury's own assessment of the fairness of its verdict, a process that *Kimoktoak* condemns.

I would therefore hold that the present case is not an appropriate one for relaxation of *Kimoktoak's per se* rule of reversal. Accordingly, I dissent from the majority's decision to remand for further proceedings on the issue of prejudice.