TAYLOR, Judge.
The appellant, Jerry Lashen Falconer, was convicted of murder made capital because two people were killed as a result of one plan or scheme. See § 13A-5-40(a)(10), Code of Alabama 1975. The jury recommended life in prison without the possibility of parole. The trial court accepted the jury’s recommendation and sentenced the appellant to life in prison without parole.
The state’s evidence tended to show that the bodies of Bill Saxton and Janice Wages were found in their house on January 16, 1991. Each had been shot in the back of the head. Saxton’s body was on the first floor near the front door and Wages’s body was found upstairs in the master bedroom. It appeared that the bedroom had been searched, and some cans with false bottoms, used as safes, were found on the bedroom floor. The cans contained papers but no money. One can with a false bottom held scales used to weigh cocaine.
Wages’s three children were in the house at the time of the shootings. Two children, Travaras Wages, age 10, and Reginald Wages, age 12, testified at trial. After stipulation, a videotaped interview with the youngest child, Marquita, age 7, was shown to the jury in lieu of her testimony at trial.[1]
*1105 Reginald testified that on the evening of the shooting he heard a knock on the front door. He heard Saxton go to the door and ask who it was. He also heard the person at the door say that he was “Fred’s cousin.” He saw the door open and saw a man shoot Saxton. He ran to his room and heard what he thought to be two people enter the house. He also stated that the kitchen was not messy before the shootings. After the shootings, several cans had been knocked over and a bottle had spilled on the floor.
Marquita stated during the videotaped interview that she was upstairs doing her homework when she heard someone knock on the door. She said she heard a “bang” and then heard someone asking her mother questions. She also said she heard two men’s voices and saw one man. Marquita was shown some photographs during the interview, but she did not identify the man she saw that night. She did hear one of the men apparently looking for something, pushing over bottles, etc. Marquita also stated that Saxton carried a gun with him most of the time.
Fred Scott, Saxton’s partner in a towing business, testified that before the shootings he had heard his brother, Demetrius Scott, say that Bill Saxton was going to be robbed. Scott also testified that he was with Saxton on the day of the shooting and that Saxton was carrying a 9-mm handgun. Scott said that Saxton always carried this gun. Scott also testified that Saxton sold cocaine and that at one time had several cans with false bottoms.
Narau Waller testified that on the evening of January 16, 1991, he, the appellant, Motty Thomas, Richard McCarty, Raymond Franklin, David Lowe, Eugene Falconer, and Demetrius Scott were at Motty’s house. Waller further testified that Demetrius Scott talked that evening about robbing Bill Saxton and Fred Scott, and that the appellant had participated in the conversation. Waller testified that later that evening he, the appellant, Thomas, McCarty, and Ricky Kennedy got into a car driven by Kennedy and talked about going to a local club. According to Waller, Kennedy brought up the subject of robbing Saxton and killing any witnesses. Waller said that the conversation centered around who would knock on the door to Saxton’s house because Saxton knew most of the occupants of the car and the appellant offered to knock on Saxton’s door because he said he was not scared. Waller said that when the conversation turned to killing people, three of the individuals asked to be let out of the car. Only the appellant and Ricky Kennedy remained in the car. After Waller got out of the car he went back to Motty’s house. He said he later heard that Saxton had been killed. Waller testified that he returned to Motty’s house the day after the shootings and that he saw the appellant, Dillard, and McCarty seated around a table with a 9-mm gun in front of them. Waller testified that the gun introduced into evidence at trial looked like the gun that the appellant had after the shootings. According to Waller, the appellant also had some cocaine and some cash on the day after the shootings.
Motty Thomas also testified that on the evening of the shootings the group discussed robbing Saxton. He testified essentially to the same facts as did Waller. He also testified that he asked to leave when the discussion among the group in the car turned to acts of murder. He said that when he was leaving the car he asked the appellant if he knew what he was doing and that the appellant said that he knew what he was doing, that he was going to get paid. Thomas stated that the appellant had a .38 caliber pistol and that Kennedy had a .32 caliber pistol and a .38 caliber pistol when they were in the car together. Thomas also stated that he returned to his house after leaving the ear and that the appellant arrived there later in the evening. He said that the appellant told him that he had been to Saxton’s house and that he had robbed him. According to Thomas, at this time the appellant had a 9-mm gun.
Another member of the group, McCarty, also testified that around 8:00 or 9:00 on the evening of January 16,1991, the group talked about robbing Saxton. He also said that later in the evening after the appellant had left Motty’s and returned, he heard the appellant say that he had gotten his “Big Boy *1106 Card,” which meant that he had killed someone. The appellant also placed a gun on the table and said, “[Yj’all can have it.” When the gun was placed on the table, Kennedy said that they needed to get rid of it “because little things like that mess me up.”
Motty Thomas also testified that he and Waller took the 9-mm gun that the appellant had been carrying after the shootings and sold it to Kito Harrison. Testimony established that after the gun was sold to Harrison, it was sold to Marcellus James and then to James Reed. Fred Scott learned about the gun from Reed. Scott retrieved it and turned it over to the police department. Scott said that the gun he got from Reed looked like the gun that Saxton normally carried.
Forensic evidence revealed that both Sax-ton and Wages were killed by bullets feed from a .367 caliber or .38 caliber gun. The bullet that killed Saxton and the one that killed Wages were fired from the same weapon. Seven fingerprints were taken from the house. Most were identified as Saxton’s or Janice Wages’. Two of the prints were not identified.
I
The appellant initially argues that there was insufficient evidence on which to find him guilty of murdering Bill Saxton and Janice Wages. The appellant’s whole argument is summarized in the following sentences. “There was no evidence offered at trial to support the proposition that he killed anyone. No fingerprints, no witness, no evidence whatever to justify the case against him going to the jury.”
The case against the appellant was largely based on circumstantial evidence.
“Circumstantial evidence is not inferior or deficient evidence. See Linzy v. State, 455 So.2d 260 (Ala.Cr.App.1984). ‘Circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused.’ Casey v. State, 401 So.2d 330, 331 (Ala.Cr.App.1981). ‘Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant’s guilt is a question for the jury and not the court.’ Cumbo v. State, 368 So.2d 871, 875 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala.1979).”
Holder v. State, 584 So.2d 872, 875-76 (Ala.Cr.App.1991). (Emphasis added.)
Judge Bowen in Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Cr.App.1978), writ denied, 368 So.2d 877 (Ala.1979), set out the standard to be applied when this court evaluates a ease based on circumstantial evidence.
“The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.
[[Image here]]
“ ‘(W)e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir.1969); Roberts v. United States, 416 F.2d 1216 (5th Cir.1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir.1967):
“‘Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry’s words,
“ ‘... the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether the jury might reasonably so conclude. Williamson v. United States, 5th Cir., 1966, 365 F.2d 12,14 (Emphasis supplied [in Cumbo].)
*1107 “ ‘The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is [to] examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged.’ [United States v.] McGlamory, 441 F.2d [130] at 135 and 136 (5th Cir.1971) ].”
(Some citations omitted.)
This court must view “the circumstantial evidence in the light most favorable to the prosecution to determine whether the jury might reasonably have found that the evidence excluded every reasonable hypothesis except guilt.” Ex parte Bailey, 590 So.2d 354, 357 (Ala.1991).
A jury, after reviewing the evidence in this case, could reasonably have concluded that the evidence and all reasonable inferences therefrom excluded every “reasonable hypothesis” except the guilt of the appellant. There was sufficient evidence for the jury to find the appellant guilty of capital murder. We see no reason to disturb the jury’s verdict.
II
The appellant next argues that the trial court erred in failing to instruct the jury on the lesser included offense of murder. The record shows that the court instructed the jury on capital murder and manslaughter. The court, when denying the appellant’s request for instructions on murder, stated that it believed that there was no evidence that would support an instruction on murder because a double murder had occurred and because of the facts surrounding the murders.
“ ‘The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.’ Alabama Code 1975, § 13A-l-9(h) (emphasis added).... [G]iven the alternative verdicts available to the jury and the verdict they returned, it is illogical to conclude that they might possibly have found [the defendant] guilty of [the lesser included offense].”
Bell v. State, 518 So.2d 840, 842 (Ala.Cr.App.1987), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).
Here, there was no rational basis for the jury to find the appellant guilty of only murder. The evidence showed that when the plan was developed to go to Saxton’s house to commit a robbery and to kill any witnesses, the appellant, by his actions, demonstrated his agreement to the plan. In this case, both deaths were deemed necessary by the perpetrators in achieving the plan or scheme of robbery.
Under the facts of this case it was not necessary to give an instruction on every conceivable lesser included offense. The jury was given the choice of finding the appellant guilty of capital murder or of manslaughter, or of finding him not guilty of any crime. The jury found him guilty of capital murder. By doing so, the jury found the necessary elements of capital murder in the appellant’s actions. No reversible error occurred here.
III
The appellant next argues that he was unlawfully convicted on the uncorroborated testimony of his accomplices. He contends that the testimony of Waller, McCarty, and Thomas should have been corroborated. However, at no time during their testimony did the appellant object on this ground. This court cannot consider matters on appeal that have not first been presented to the trial court for its determination. Johnson v. State, 479 So.2d 1377 (Ala.Cr.App.1985); Trawick v. State, 431 So.2d 574 (Ala.Cr.App.1983).
IV
The appellant also contends that the court should not have allowed Waller, McCarty, and Thomas to testify because their testimony was given prior to the establishment of proof of the conspiracy. However, there was no objection on this ground during any of the testimony by these three men. Thus, this issue has not been preserved for our consideration. Johnson.
*1108 V
Last, the appellant argues the 9-mm gun should not have been received into evidence because, he says, the chain of custody of the gun was not sufficiently established. This issue, however, is not correctly before this court. The record shows that a motion in limine was made concerning the admissibility of the gun. The court denied the motion, but made it known that its ruling on the motion was not its final ruling on the matter. However, when the gun was offered into evidence the defense made no objection. The making of a motion in limine, concerning the admittance of an item of evidence, does not preserve the issue for appeal unless an objection is also made when the item is offered into evidence. Bacot v. State, 597 So.2d 754 (Ala.Cr.App.1992).
For the foregoing reasons, the judgment in this cause is due to be affirmed.
AFFIRMED.
All the Judges concur.

. The State argues that this court should not review the videotape because, it says, the tape was not included in the record on appeal and was not admitted into evidence. Though the tape of Marquita’s statement was not admitted into evidence like other exhibits, it is part of the record and was considered by the jury. By stipulation of all parties, the tape acquired the same status as testimonial evidence offered on the witness stand. This court has reviewed and has considered the videotaped interview with Marquita Wages as did the jury that convicted the appellant.