[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 20 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 21 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 22 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 23 
 On Application For Rehearing
This court's opinion of August 25, 2000, is withdrawn, and the following opinion is substituted therefor.
The appellant, Matthew Reeves, was convicted of murder made capital because *Page 24 
it was committed during the course of a robbery in the first degree. See § 13A-5-40(a)(2), Ala. Code 1975. The jury, by a vote of 10-2, recommended that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death.
The State's evidence tended to show the following. On November 27, 1996, the appellant (who was 18 years old at the time) and his younger brother, Julius, visited Brenda Suttles and Suttles's 15-year-old cousin, Emanuel, at Suttles's house on Lavender Street in Selma. There, according to Suttles, everyone agreed to go out "looking for some robberies." (R. 684.) Shortly after noon that day, the foursome left Suttles's house on foot and walked to a nearby McDonald's restaurant, where they saw Jason Powell driving by in his car. The appellant's brother, Julius, flagged Powell down, and Powell agreed to give the group a ride.
Brenda Suttles and Emanuel Suttles testified that after the foursome got into Powell's car, Julius Reeves suggested that they go to White Hall, a town in neighboring Lowndes County, to rob a drug dealer. According to Brenda Suttles, everyone in the car agreed to the plan. (Powell, who also testified at trial, denied hearing the discussion about a robbery.) Before leaving Selma, the group stopped at an apartment on Broad Street. Julius Reeves went inside the apartment and returned to the car a short time later carrying a shotgun, which he handed to the appellant. With Powell driving, the group then headed for White Hall.
Before they reached White Hall, however, Powell's car broke down on a dirt road off Highway 80. Shortly thereafter, a passing motorist, Duane Smith, stopped and told the group that he was in a hurry to meet some friends to go hunting, but that he would return around sunset and would take them to get help then. For the next couple of hours, the group sat in Powell's car and listened to music, until another passing motorist, Willie Johnson, stopped in his pickup truck and offered to tow Powell's car to Selma. Using some chains that he kept in his pickup truck, Johnson hooked Powell's car to the back of his truck. With Julius Reeves riding in the truck with him and the others in Powell's car, Johnson towed the car to the Selma residence where the appellant and Julius lived with their mother.
When they arrived at the Reeveses' house, Julius Reeves got out of Johnson's truck and told the others that Johnson wanted $25 for towing them. However, no one had any money to pay Johnson. Julius Reeves then offered to give Johnson a ring as payment if Johnson would drive him to his girlfriend's house to get the ring. Johnson agreed and he unhooked Powell's car from his truck. According to Jason Powell and Emanuel Suttles, Julius Reeves at this point told the others that Johnson was going to be their robbery victim. While Jason Powell and Emanuel Suttles stayed behind with Powell's car in front of the Reeveses' house, Julius Reeves got back in the cab of the truck with Johnson, and Brenda Suttles climbed into the rear bed of the truck. Testimony indicated that when Johnson started the truck, the appellant jumped into the rear bed of the truck with the shotgun, hiding the weapon behind his leg as he did so.
When they arrived at Julius's girlfriend's house in Johnson's truck, Julius went inside and retrieved the ring he had promised to give Johnson as payment. According to Brenda Suttles, when Julius came out of the house, he walked to the rear of Johnson's truck and told her and the appellant that he was not going to let Johnson keep the ring. After Julius got back in the cab of the truck, Johnson *Page 25 
drove everyone back to the Reeveses' house.
Jason Powell and Emanuel Suttles, who had remained at the house with Powell's car, testified that sometime around 7:00 p.m., they saw Johnson's truck drive by the house and turn into an alley — known as Crockett's Alley — behind the house. According to Brenda Suttles, who was in the rear bed of the truck with the appellant, just as the truck came to a stop in the alley, she heard a loud "pow" sound. (R. 704.) Suttles testified that when she looked up, the appellant was withdrawing the barrel of the shotgun from the open rear window of the truck's cab. Johnson had been shot in the neck and was slumped over in the driver's seat. Suttles testified that Julius Reeves jumped out of the truck's cab and asked the appellant what he had done, and that the appellant then told Julius and Suttles to go through Johnson's pockets to "get his money." (R. 704.) Suttles stated that Julius then pulled Johnson out of the truck and went through his pockets, giving the money he found in the pockets to the appellant. After Julius had gone through Johnson's pockets, Suttles helped him put Johnson back in the truck's cab. According to Suttles, Johnson was bleeding heavily and making "gagging" noises. (R. 721.)
Jason Powell and Emanuel Suttles testified that they heard the gunshot after Johnson's truck pulled into Crockett's Alley and that a short time later they saw the appellant, Julius Reeves, and Brenda Suttles run out of the alley and into the Reeveses' house. The appellant was carrying a shotgun, they said. They followed the appellant, Julius Reeves, and Brenda Suttles into the Reeveses' house and saw the appellant place the shotgun under a bed in his bedroom. The appellant told Julius and Brenda Suttles to change out of their bloodstained clothes and shoes, and he took the clothes and shoes and stuffed them under a dresser in his bedroom. According to Emanuel Suttles, as the appellant, Julius, and Brenda changed their clothes, they were "jumping and hollering" and celebrating about "all the stuff [they] got" from Johnson. (R. 842.) Jason Powell testified that he heard the appellant say, "I made the money." (R. 786.)
After changing their clothes, the appellant, Julius Reeves, and Brenda Suttles ran to Suttles's house. On the way, the appellant stopped to talk to his girlfriend, telling her that if she should be questioned by the police, to tell them that he had been with her all day. At Suttles's house, the appellant divided the money taken from Johnson — approximately $360 — among himself, Julius Reeves, and Brenda Suttles. Testimony indicated that throughout the evening, the appellant continued to brag about having shot Johnson. Several witnesses who were present at Suttles's house that evening testified that they saw the appellant dancing, "throwing up" gang signs, and pretending to pump a shotgun. Brenda Suttles testified that as the appellant danced, he would jerk his body around in a manner "mock[ing] the way that Willie Johnson had died." (R. 713.) The appellant was also heard to say that the shooting would earn him a "teardrop," a gang tattoo acquired for killing someone. (R. 720.)
Yolanda Blevins, who was present during the post-shooting "celebration" at Suttles's house, testified that the appellant called her into the kitchen and told her that he had shot a man in a truck after catching a ride with him. Blevins noticed that there was what appeared to be dried blood on the appellant's hands. LaTosha Rodgers, who was also present at Suttles's house, testified that the appellant told her that he had "just shot somebody" in the alley. (R. 924.) *Page 26 
At around 2:00 a.m. on November 28, 1996 (approximately seven hours after the shooting), Selma police received a report of a suspicious vehicle parked in Crockett's Alley. When police officers investigated, they found Johnson's body slumped across the seat of his pickup truck. There was a pool of blood on the ground on the driver's side of the truck. Several coins and a diamond ring were on the ground near the truck. On the floorboard of the truck, police found wadding from a shotgun shell. The pockets of Johnson's pants had been turned inside out and were empty. Testimony at trial indicated that Johnson was a longtime employee of the Selma Housing Authority and that on the afternoon of November 27, 1996, he had cashed his paycheck, which had been in the amount of $500.
At the shooting scene on the morning of November 28, police also discovered a trail of blood leading from Johnson's truck to the Reeveses' house. Randy Tucker, a canine-patrol officer with the Selma Police Department, testified that his dog tracked the blood trail from the pool of blood next to Johnson's truck, down Crockett's Alley, through the yard at 2126 Selma Avenue (the residence next to the alley), and ultimately to the front steps of the Reeveses' house at 2128 Selma Avenue.
Pat Grindle, the detective in charge of investigating Johnson's murder, went to the Reeveses' house after learning that the blood trail led there. Det. Grindle testified that he obtained the consent of the appellant's mother, Marzetta Reeves, to search the house. In a bedroom shared by the appellant and Julius, Det. Grindle found bloodstained clothes and bloodstained shoes; under a bed in this bedroom, Det. Grindle found a shotgun. In searching the kitchen, Det. Grindle found a pair of bloodstained pants. After making these discoveries, Det. Grindle questioned Marzetta Reeves and several other persons who were in the house at that time. Det. Grindle stated that he learned that the bloodstained clothes and shoes belonged to Julius Reeves, Brenda Suttles, and the appellant. Det. Grindle then went to Suttles's house in an attempt to locate the three. At Suttles's house, Det. Grindle found the appellant lying on a couch in a front room. The appellant was placed under arrest, and the officers seized a balled-up bloodstained jacket he was using as a headrest on the couch. Det. Grindle later returned to the Reeveses' residence, where he seized a 12-gauge shotgun shell from a garbage can in the bathroom.
An autopsy revealed that Johnson had died from a shotgun wound to his neck that severed the carotid artery, causing him to bleed to death over a period of several minutes. Bloodstain patterns in Johnson's truck indicated that he was sitting upright in the driver's seat, facing forward, when he was shot from behind, through the open rear window. The bloodstain patterns also indicated that the driver's side door had been opened and closed shortly after Johnson was shot.
Testimony indicated that the appellant's fingerprints were found on the shotgun that Det. Grindle had seized from under the bed in the appellant's bedroom. Brenda Suttles's and Julius Reeves's fingerprints were found on a fender of Johnson's truck. Joseph Saloom, a firearms expert with the Alabama Department of Forensic Sciences, testified that the shotgun shell seized from the bathroom at the Reeveses' residence was of the type commonly fired from the shotgun seized from the appellant's bedroom. Saloom stated that the shotgun-shell wadding found on the floorboard of Johnson's truck was of the type commonly found in the kind of shotgun shell seized from the bathroom at the Reeveses' residence. *Page 27 
On appeal, the appellant raises several issues, many of which he did not raise by objection in the trial court. Because the appellant was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343
(Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied,507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State,577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" is error "so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings."Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986,104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney,662 F.2d 1148 1152 (5th Cir. 1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209
(Ala.Crim.App. 1998), aff'd, 778 So.2d 237 (Ala. 2000). This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115,115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1,15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting, in turn, UnitedStates v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816
(1982). With these principles in mind, we address each of the issues the appellant raises on appeal.
 I.
The appellant contends that the trial court should have removed prospective juror B.P. for cause because, he says, her responses during voir dire "indicated that once she found someone guilty of intentionally killing someone she would consider only the death penalty." (Appellant's brief to this court, pp. 43-44.) We disagree.
In Taylor v. State, 666 So.2d 36 (Ala.Crim.App. 1994), aff'd,666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928,133 L.Ed.2d 856 (1996), we stated:
 "`A prospective juror may not be excluded from a capital case for personal opposition to the death penalty unless the juror's beliefs would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (footnote omitted). On the other hand, "[a] venire member who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App. 1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). Accord, Bracewell v. State, 506 So.2d 354, 358
(Ala.Cr.App. 1986).' *Page 28 
 "Kuenzel v. State, 577 So.2d 474, 484-85 (1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 "`The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841
(1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.
 "`A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. "A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala. 1981).'
 "Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App. 1988), affirmed, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383
(1989)."
666 So.2d at 46-47. Further,
 "[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. `A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused.' Martin v. State, 548 So.2d 488, 491
(Ala.Crim.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id."
Smith v. State, 698 So.2d 189, 198 (Ala.Crim.App. 1996), aff'd,698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385,139 L.Ed.2d 300 (1997) (emphasis added).
 "Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. Knop v. McCain, 561 So.2d 229 (Ala. 1989); Siebert v. State, 562 So.2d 586 (Ala.Cr.App. 1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Perryman v. State, 558 So.2d 972 (Ala.Cr.App. 1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or *Page 29 
deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. Knop, supra; Siebert, supra; Perryman, supra."
Ex parte Land, 678 So.2d 224, 240 (Ala.), cert. denied, 519 U.S. 933,117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
Although the record reflects that B.P. expressed strong support for the death penalty at times during the voir dire examination, the record also reflects that she stated on several occasions that she could give equal and fair consideration to both the death penalty and life imprisonment without parole as possible punishments. She repeatedly stated that she would listen to the facts and the law as instructed by the trial court and that she could follow the trial court's instructions. She also stated that if appropriate, she could recommend life imprisonment without the possibility of parole. In denying the appellant's challenge for cause as to B.P., the trial court said: "I think this juror has said on a number of occasions that she can give fair consideration to both of the possible punishments. She could keep an open mind to the end." (R. 430.) Accordingly, the trial court did not abuse its discretion in denying the appellant's challenge for cause as to juror B.P.
 II.
The appellant contends that he was deprived of his right to a fair trial by an impartial jury because, he says, two jurors, who sat on the jury for a portion of his trial, but who were excused by the trial court before the guilt-phase deliberations began, failed to respond candidly to questions posed during the voir dire examination.
The record reflects that on the morning of the second day of trial, after the State had called its first eight witnesses, juror P.T. approached the trial judge to inform him that she had remembered that the appellant's brother Julius had stolen her car some six or seven years earlier. The following then occurred outside the presence of the remaining members of the jury:
 "[The Court]: [P.T.], how about stepping over this way. When I arrived in the office this morning, I was approached by [P.T.] who is one of our jurors. She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis, I guess you would say, and that it deeply affected [P.T.] and her family, this car theft involving Julius Reeves. She does not recall whether Matthew was involved. She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of this vehicle.
 "[P.T.] has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case. And at this time I'm going to excuse [P.T.]. And our first alternate will be taking her place. Is there any objection?
"[Prosecutor]: None from the State.
"[Defense counsel]: None from the defense."
(R. 803.)
Subsequently, during the afternoon recess on the second day of trial, juror J.D. also approached the trial judge to inform him that he had remembered that he knew *Page 30 
the victim, Willie Johnson. The following then occurred in the judge's chambers:
 "[The Court]: I explained to the attorneys that [J.D.] had had a recollection of Mr. Johnson, the victim in this case. He disclosed that to me just a few minutes ago. And [J.D.], I'm going to ask these attorneys to basically ask — well, let me say this. You tell them what you told me, and then I will let them ask you any questions.
 "[J.D.]: I told him that I knew him from another guy. I seen him with the family. I was thinking that I knew the truck and knew the guy. But I never could picture who it really was until I saw him and his name is Willie, too. He worked for Roy out there. I've got a key to Roy's shop. I go up there sometimes and work on my truck and whatever. Willie helped him, and he and Roy were friends. And he'd come up there a lot when I was working on my truck and stay around and talk. And we talked about the truck before, how I kept things in tune. That's just the only way I knew him was from Roy's shop. I didn't even know this had happened to him.
 "[Defense counsel]: When did you start thinking that you might have known the truck?
 "[J.D.]: Last night after they was talking about Tyler because I live out there. I couldn't ever figure out who it was until I saw that other Willie today. I asked, `What are you doing here?' He said, `I'm in there with the family.' So I knew it was the same one. He had always hung around with him and was on good terms with Roy. He lives out there now.
 "[Defense counsel]: What prompted you to tell Judge Jones about it?
 "[J.D.]: I mean I figured y'all would want to know that because the first day whenever y'all asked if anybody knew him or whether we know anything about it. I didn't know at that time then who it was.
 "[Defense counsel]: When is it that you saw this man? Was it out in the hall?
"[J.D.]: Uh-huh.
"[Defense counsel]: When did you notice him, a minute ago?
 "[J.D.]: Just a minute ago getting into the elevator or walking down the stairs. He was going down, going outside to smoke.
"[Defense counsel]: Are you uncomfortable now?
 "[J.D.]: Not really, I just figured that I needed to tell the Judge because I mean I wasn't close enough to the guy to even know what happened to him. I hadn't seen him in a while.
 "[Prosecutor]: May I? [J.D.], you did — the person you were talking to that you know that works, I think you said worked with Mr. Roy Moore, this is a person that was in the hallway?
"[J.D.]: Yes. He's been sitting out there I think.
"[Prosecutor]: In the courtroom in there?
"[J.D.]: Yes, sir.
"[Prosecutor]: Do you know that person fairly well?
"[J.D.]: Yes, sir.
 "[Prosecutor]: Did you know the deceased in this case at all?
 "[J.D.]: I knew him, but he couldn't tell you my name, and I knew his name was Willie. That was all I ever knew.
 "[Prosecutor]: How long have you known of and concerning him?
 "[J.D.]: Maybe three years maybe, off and on. I just saw him around the shop or saw him pass when him and the other Willie would be riding down the road. I *Page 31 
knew Willie would be there with him. They were always together.
 "[Prosecutor]: Do you know anything about his family, his background, or anything about what he did or where he worked?
"[J.D.]: No, sir.
 "[Prosecutor]: Have you ever worked with him, been with him, had any contact with him?
 "[J.D.]: No, sir, just when he walked in that shop maybe once or twice when we were working on our trucks.
 "[Prosecutor]: Does that knowledge put you in a position where you can't serve in this case and make a fair judgment based on what you have heard?
"[J.D.]: No, sir.
 "[The Court]: Do you feel uncomfortable? That's a different question.
"[J.D.]: No, sir.
 "[Prosecutor]: You haven't heard all of the evidence in this case, but are you still in a position where you can either convict or not convict based on what you decide the evidence is at the end?
"[J.D.]: Yes, sir.
"[Prosecutor]: In spite of this connection with this man?
"[J.D.]: Yes, sir.
 "[Prosecutor]: You could still — if you thought the evidence warranted it, you could turn the man here loose?
"[J.D.]: Yes, sir.
 "[Defense counsel]: This Willie person that you said you had seen him sitting in the courtroom all day?
 "[J.D.]: I thought I had recognized him, but I never did look really hard until I walked outside and walked right by him. Then I knew it was him.
 "[Defense counsel]: Having recognized him, do you know how long he has been in the courtroom?
"[J.D.]: No, sir.
 "[Defense counsel]: The photographs of the truck, is that something that you have seen?
 "[J.D.]: The one today where you could see in the garage, you know, you could see the whole truck. Really, I knew then that it was the same truck I have been in before.
 "[Defense counsel]: The relationship with this other Willie, was it a knowledge from going up to Roy Moore's shop?
 "[J.D.]: Me and Roy Moore, we are all real good friends, him and my dad, and I used their shop to get air and tools or whatever, you know. I've got a key to their shop and everything. And he has worked for Roy for, I don't know, 10 years or more probably.
 "[Defense counsel]: What about the fact that this Willie is closely related to the victim? Would that have any bearing?
 "[J.D.]: I don't even know if he's related to him or, you know — I don't really know how he's kin to him. It has no bearing on me really.
 "[Defense counsel]: If he's up here supporting, in support of the family, that wouldn't have any effect on you?
"[J.D.]: No, sir.
"[Defense counsel]: You were actually in that truck?
 "[J.D.]: Yes, we used it one time, me and Willie out here when we was replacing brake shoes on my truck. We came to town. I had to get some new brake shoes.
"[The Court]: Anything else?
"[Prosecutor]: No.
"[The Court]: You may take a seat back in the jury room."
(R. 993-98.) Following this exchange, the appellant's counsel moved to have juror *Page 32 
J.D. excused from the jury. Because juror J.D. was an alternate juror, however, the trial court reserved ruling on the appellant's motion until the end of trial. The record reflects that juror J.D. was dismissed as an alternate before deliberations.
On appeal, the appellant contends that he was denied his right to a fair trial by an impartial jury when jurors P.T. and J.D. failed to disclose during voir dire examination that they knew Julius Reeves and the victim Johnson, respectively. The appellant maintains, and the record reflects, that when prospective jurors were asked during voir dire examination whether they knew the appellant or any member of his family, P.T. did not respond. We note, however, that prospective jurors were never asked during the voir dire examination whether they knew the victim, although they were briefly informed of the facts of the case and the names of the people involved, including the victim's name. We also note that the appellant did not object when P.T. disclosed that Julius Reeves had stolen her car, when J.D. disclosed that he knew Johnson, or when the trial court removed these jurors before deliberations. Nor did the appellant assert this particular claim in his motion for a new trial. Although the appellant moved to have juror J.D. excused when J.D. first indicated that he had known the victim, and the trial court initially reserved ruling on the motion, the trial court nevertheless excused juror J.D. just before deliberations; thus, there is no adverse ruling from which the appellant can appeal. Because this particular claim was never presented to the trial court and because the trial court never ruled on the only motion made by the appellant raising this issue, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P. We find no error, plain or otherwise.
There is simply no possibility that the appellant was harmed by the failure of P.T. or J.D. to disclose during the voir dire examination that P.T. knew Julius Reeves or that J.D. had known the victim Johnson. It is clear from the record that neither P.T. nor J.D. willfully withheld the information and that they merely failed to recollect at the time of voir dire examination their remote connections with Julius Reeves and Johnson. Both came forward and informed the trial court as soon as they remembered the connections. Moreover, both P.T. and J.D. were excused from the jury before the guilt-phase deliberations began. There is no evidence indicating, and the appellant does not even allege, that P.T. or J.D. informed any of the other jurors who ultimately sat on the jury about their connections with the case, or that any of the other jurors were influenced by P.T. and J.D.'s connections with the case or by the fact that the two were excused before deliberations. Jurors were instructed several times throughout the trial not to discuss the case among themselves or with anyone else, and jurors are presumed to follow the instructions they are given. See, e.g., Taylor v. State, 666 So.2d 36
(Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied,516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Accordingly, we find no error, much less plain error, as to this claim.
 III.
The appellant contends that the trial court erred in denying his motion to suppress several items of evidence that were seized from his bedroom at his mother's residence.
At the suppression hearing, Det. Grindle testified that on the morning of November 28, 1996, after he was called to the scene of the shooting in Crockett's Alley, he learned that Officer Randy Tucker's dog *Page 33 
had tracked a trail of blood to a house at 2128 Selma Avenue. Det. Grindle had had prior dealings with the Reeves family, and he knew that that address was the address of the appellant's mother, Marzetta Reeves, and that the appellant and Julius Reeves lived at that address with their mother. Shortly after learning that the dog had tracked the trail of blood to the Reeveses' house, Det. Grindle went to the house and knocked on the front door. Marzetta Reeves answered. Det. Grindle testified that after he identified himself, he told Ms. Reeves that he was investigating a shooting and that a dog had "tracked" to her residence. According to Det. Grindle, he then asked Ms. Reeves if she would consent to a search of her house. Det. Grindle stated that Ms. Reeves orally consented to the search and told him that "she had nothing to hide." (R. 545.) Det. Grindle then wrote out a consent form on a piece of paper. He stated that Ms. Reeves read the form and signed it. The signed consent form was admitted into evidence at the suppression hearing (and later during the trial) without objection. The consent form read as follows:
 "I, Marzetta Reeves, do authorize Det. P. Grindle and any other officers he designates to assist him in the search of my residence at 2128 Selma Avenue. I have been advised as to the fact that Det. Grindle is investigating a shooting. With this in mind, I have agreed to allow Det. Grindle to search my residence. I have not been coerced in any way into giving my permission to Det. Grindle in the search of my residence."
(C. 252.)
Det. Grindle and another officer conducted the search of the residence. Det. Grindle stated that he found several items of bloodstained clothing, bloodstained shoes, and a shotgun in a bedroom that the appellant and his brother Julius shared. In addition, he found a pair of bloodstained pants in the kitchen. Det. Grindle stated that there was only one internal door inside the house — to the bathroom. According to Det. Grindle, there was no door to the kitchen or to the bedroom shared by the appellant and Julius.
Marzetta Reeves denied that she gave Det. Grindle consent to search her house. According to Ms. Reeves, Det. Grindle never asked for her consent to search the house, but instead asked only if he could look inside the house for the appellant and Julius. Ms. Reeves claimed that Det. Grindle then had her sign a blank piece of paper, which she said she believed to be consent to search the house for her sons, not a consent to conduct a general search. Ms. Reeves maintained that the search of her house was conducted without her consent.
On appeal, the appellant does not argue that his mother did not consent to the search of her house. Instead, he contends that "the prosecution did not elicit even conflicting evidence that Marzetta Reeves had authority to consent to the search of the appellant Reeves's room." (Appellant's brief to this court, p. 30.) In the trial court, however, the appellant did not raise the issue whether his mother had authority to consent to the search of his bedroom; rather, he argued that his mother never consented to the search of her house. Because the claim the appellant raises on appeal was not presented to the trial court, we review it under the plain-error rule. See Rule 45A, Ala.R.App.P.
In Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Crim.App. 1998), aff'd in pertinent part, rev'd on other grounds, [Ms. 1980810, July 21, 2000] ___ So.2d ___ (Ala. 2000), we stated the following regarding the authority of a parent to consent to the search of a child's bedroom in the parents' home:
 "Burgess's contention that his mother did not have authority to consent to a *Page 34 
search of his bedroom is likewise without merit. As this court stated in Taylor v. State, 491 So.2d 1042
(Ala.Cr.App. 1986):
 "`"[T]he parent's rights are `superior to the rights of children who live in the house,' which means . . . that the parent's consent would be effective even when the child was present and objecting." W. LaFave, 2 Search and Seizure § 8.4 (1978). "Even if a minor child, living in the bosom of his family, may think of a room as `his,' the overall dominance will be in his parents." United States v. Di Prima, 472 F.2d 550, 551 (1st Cir. 1973).
 "`"If a son or daughter, whether or not still a minor, is residing in the home of the parents, generally it is within the authority of the father or mother to consent to a police search of that home which will be effective against the offspring. This is unquestionably so as to areas of common usage, and is also true of the bedroom of the son or daughter when a parent has ready access for purposes of cleaning it or when because of the minority of the offspring the parent is still exercising parental authority. Because in the latter circumstances the parent's rights are `superior to the rights of children who live in the house,' a parent's consent would prevail even if the child were present and objecting and even if the child had taken special measures in an effort to ensure he had exclusive use of the area searched." W. LaFave, 1 Criminal Procedure § 3.10(e) (1984).'
"491 So.2d at 1045."
___ So.2d at ___.
At the time of the search, the appellant was 18 years old and was living in his mother's house. The appellant concedes that his mother consented to the search of her house, including his bedroom. As the appellant's parent, Ms. Reeves clearly had the authority to consent to the search of the appellant's bedroom, which, lacking a door, was readily accessible to Ms. Reeves and to anyone else in her house. Accordingly, the trial court properly allowed the State to introduce the items of evidence seized from the appellant's bedroom. There was no error, plain or otherwise, in admitting this evidence.
 IV.
The appellant contends that the trial court erred in denying his motion to suppress evidence in the form of a shotgun shell seized from the Reeveses' house following the appellant's arrest.
In a post-arrest statement to police — which was not introduced into evidence by the State — the appellant directed Det. Grindle to a shotgun shell in a garbage can in the bathroom of the Reeveses' house; the shell was admitted into evidence at trial. The appellant argues that he was arrested without probable cause, that the shotgun shell was the fruit of this illegal arrest, and that, consequently, his motion to suppress the shell should have been granted. (Appellant's brief to this court, p. 33.) We disagree.
As noted above, Det. Grindle testified at the suppression hearing that he went to the Reeveses' house on the morning of November 28 based on Officer Tucker's information that a dog had tracked a trail of blood from the shooting scene in Crockett's Alley to the house. After the Reeveses' house was searched that morning, Det. Grindle interviewed four people, one of whom was the appellant's mother, who *Page 35 
were present at the house at the time of the search. From these interviews, Det. Grindle learned that the bloodstained clothing and shoes found in the house during the search belonged to the appellant, his brother Julius, and Brenda Suttles. Det. Grindle also learned that Brenda Suttles had been at the Reeveses' house earlier in the day with another male. From police department files, Det. Grindle obtained Suttles's address and proceeded to her house in an attempt to locate her, Julius Reeves, and the appellant. Det. Grindle testified that when he arrived at Suttles's house, in the morning hours of November 28, he knocked on the door, and Suttles's sister answered. Through the doorway, Det. Grindle said, he saw the appellant lying on a couch. He then entered the residence, arrested the appellant, and seized a bloodstained jacket that was on the couch where the appellant had been lying. Neither Brenda Suttles nor Julius Reeves was apprehended at that time.
"Section 15-10-3[(a)](3), Ala. Code 1975, provides that an officer may arrest an individual without a warrant when a felony has been committed and he has reasonable cause to believe that the individual arrested committed the felony." Sockwell v. State, 675 So.2d 4, 13 (Ala.Crim.App. 1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838,117 S.Ct. 115, 136 L.Ed.2d 67 (1996). "[R]easonable cause has been equated with probable cause." Daniels v. State, 534 So.2d 628, 651
(Ala.Crim.App. 1985), aff'd, 534 So.2d 656 (Ala. 1986), cert. denied,479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987), opinion after remand, 534 So.2d 658 (Ala.Crim.App. 1987), aff'd, 534 So.2d 664 (Ala. 1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007
(1989). "`The rule of reasonable or probable cause is a "practical, nontechnical conception,"'" id., quoting Tice v. State, 386 So.2d 1180,1183 (Ala.Crim.App.), cert. denied, 386 So.2d 1187 (Ala. 1980), and "[t]he level of evidence needed for a finding of probable cause is low."State v. Johnson, 682 So.2d 385, 387 (Ala. 1996). "`"Probable cause exists where `the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."'"State v. Johnson, 682 So.2d at 388, quoting Young v. State, 372 So.2d 409,410 (Ala.Crim.App. 1979), quoting, in turn, Draper v. United States,358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Put another way, "[p]robable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty." Sockwell, 675 So.2d at 13. "`An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest]. . . . "Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."'" State v. Johnson, 682 So.2d at 387-88, quoting Stone v. State, 501 So.2d 562, 565 (Ala.Crim.App. 1986), overruled on other grounds, Ex parte Boyd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989).
 "`In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. . . .' Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949). `"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."' Id. `Probable cause to arrest is measured against *Page 36 
an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.' Cox v. State, 489 So.2d 612 (Ala.Cr.App. 1985)."
Dixon v. State, 588 So.2d 903, 906 (Ala. 1991). See also Minor v.State, 780 So.2d 707, 733 (Ala.Crim.App. 1999), rev'd on other grounds,780 So.2d 796 (Ala. 2000); and McWhorter v. State, 781 So.2d 257, 288
(Ala.Crim.App. 1999), aff'd, 781 So.2d 330 (Ala. 2000). "In making the determination as to whether probable cause exists for a warrantless arrest, we must examine the totality of the circumstances surrounding the arrest." Sockwell, 675 So.2d at 13, quoting Daniels, 534 So.2d at 651.
Here, based on the knowledge he had accumulated through his investigation, Det. Grindle had probable cause to arrest the appellant at Suttles's house on the morning of November 28, 1996. There was a trail of blood leading from where Johnson's body was found to the Reeveses' house. Bloodstained clothing and shoes, reportedly belonging to the appellant, Julius Reeves, and Brenda Suttles, were found in the appellant's bedroom in the Reeveses' house. In addition, a shotgun was found under the appellant's bed. Wadding from a shotgun shell was found on the floorboard of Johnson's truck at the shooting scene. When Det. Grindle arrived at Brenda Suttles's house, he found the appellant lying on a couch. Next to the appellant on the couch was a bloodstained jacket. These facts and circumstances were sufficient to lead "a reasonable person of ordinary caution, acting impartially" to believe that the appellant had participated in Johnson's shooting. There was probable cause to arrest the appellant. Accordingly, the trial court did not err in denying the appellant's motion to suppress the shotgun shell that the appellant directed Det. Grindle to after his arrest.
 V.
The appellant contends that the trial court improperly limited his cross-examination of Jason Powell, who testified for the State. Specifically, he argued that he should have been permitted to cross-examine Powell regarding charges pending against him in order to show that Powell was biased in favor of the State.
The record reflects that sometime after Johnson's body was discovered, Powell gave police a statement in which he recounted the events of November 27, 1996. Although that statement is not included in the record on appeal, it appears from the record that Powell's testimony at trial was substantially the same as the statement he gave to police. When cross-examining Powell at trial, the appellant's counsel attempted to impeach Powell by questioning him about criminal charges pending against him in Wilcox County. Apparently, at the time of the appellant's trial, Powell was in jail awaiting a trial on those charges. When the prosecutor objected to defense counsel's inquiry into this subject, the following occurred outside of the jury's hearing:
 "[The Court]: I don't mind you asking him questions as long as it's not regarding some suspension or some expulsion from school for which there has not been some type of appropriate charge, or conviction I should say. I don't know where you're going with that.
 "[Defense counsel]: If he has got charges hanging over his head, he would have a bias in favor of the State.
"[Prosecutor]: It's totally unrelated to anything here.
 "[The Court]: Is there any agreement on this guy? What I'm saying is, is there an appropriate conviction that *Page 37 
you're aware of that you can cross-examine him on?
"[Defense counsel]: No, I'm not.
 "[The Court]: The second question is, is there any type of agreement with [Powell] regarding his charges in Wilcox County for his testimony here today?
"[Prosecutor]: None whatsoever, nor in this case.
 "[Defense counsel]: Let me go ahead and state my grounds why I think I should be able to go into this matter, what the criminal charges are if he's in jail. We think that we are entitled as a matter of Alabama statutory law as well as under the 6th and 14th Amendments of the United States Constitution and Article 1, Section 6, of the state constitution to be able to cross-examine him to show any possible bias that he may have in favor of the State or any prejudice against the defense. We think certainly if this man has got criminal charges hanging over his head, he wouldn't want to do anything to tick off the State. But I understand the Court is saying, `don't go into that.' I wanted to make sure I don't have to ask every single question for you to rule on it.
 "[The Court]: Sustain the objection based on the fact that, number one, there is no agreement regarding this testimony or any charges. Number two, you can't tell me of any conviction that would be an appropriate conviction for impeachment purposes of his testimony, correct?
"[Defense counsel]: As far as I know, there is not."
(R. 793-94.) The appellant's counsel then continued cross-examining Powell without referring to any pending charges. At the conclusion of Powell's testimony, court was recessed for the day.
When the trial resumed the next morning, the following exchange occurred:
 "[Defense counsel]: Also, with respect to witness Jason Powell, we had a sidebar at which the Court ruled that we would not be allowed to ask Mr. Powell questions along the lines of what, if any, criminal cases he had pending in Wilcox County. The State said that they were aware that things were pending. [Cocounsel for the defense] this morning went into the clerk's office and pulled up some computer records that would indicate we think what we would have been able to show had we been able to go into that. That's marked as Defendant's Exhibit Number 5. And just for purposes of the record, we would like to put that in the record.
 "[The Court]: Let me ask you a question, though, because I did rule on your objection or the State's objection to your question regarding Jason Powell's pending charges. Can you tell me or give me any indication as to how that would be admissible under Alabama Rules of Evidence?
 "[Defense counsel]: It would be admissible to show bias of the witness in favor of the State, that he would have a reason with all of these things hanging over his head to do everything he can to help himself in those cases by testifying in this case.
 "[Prosecutor]: We counter that with the fact that there is no evidence of that. To impeach a witness, you need a conviction of a crime involving moral turpitude or some other evidence to show that the witness has some particular reason, a deal or an understanding, an agreement or something of that nature. But the mere fact that he's been charged with something is not permitted under the law, neither by the State or the defense.
"[The Court]: That was my — *Page 38 
 "[Prosecutor]: The man gave these statements [to the police] back way before he had any charges brought against him. There is no understanding whatsoever.
 "[The Court]: Are you telling me that the statement that Jason Powell gave to the police predated the charges that are presently pending?
"[Prosecutor]: Yes, sir.
 "[Defense counsel]: We would say the rule — we cite Alabama Rules of Evidence 616, `Impeachment by Evidence of Bias, Prejudice, or Interest.' I'm reading out of Gamble's Alabama Rules of Evidence Trial Manual. `This rule retains the preexisting Alabama practice of allowing one to impeach a witness with evidence of acts, statements, or relationship indicating bias.' The case cites the bias that may be shown includes both bias for a party and bias against a party.
 "[The Court]: How do you want to respond to the fact that the statement given predates the charge?
 "[Defense counsel]: I think that would go to the weight rather than admissibility.
 "[Prosecutor]: The State's biggest problem in this case, we weren't real sure how Mr. Powell was going to respond, and he is now in jail. And we are now putting him — we have got to deal with what we've got.
 "[The Court]: My ruling will stand. Your exception is noted for the record."
(R. 804-06.)
It is well settled that "[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him," McMillian v.State, 594 So.2d 1253, 1261 (Ala.Crim.App. 1991), remanded on other grounds, 594 So.2d 1288 (Ala. 1992), opinion after remand, 616 So.2d 933
(Ala.Crim.App. 1993), citing Perry v. Brakefield, 534 So.2d 602 (Ala. 1988), and § 12-21-137, Ala. Code 1975, and that a party should be given "wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge." Williams v. State,710 So.2d 1276, 1327 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699
(1998). It is equally well established, however, "that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse."Long v. State, 621 So.2d 383, 388 (Ala.Crim.App. 1993), cert. denied,510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v.State, 565 So.2d 688, 689 (Ala.Crim.App. 1990). "The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating." Newsome v. State, 570 So.2d 703, 714 (Ala.Crim.App. 1989). "On appeal, the party claiming an abuse of such discretion bears the burden of persuasion." Ross v. State, 555 So.2d 1179, 1180
(Ala.Crim.App. 1989), quoting Hembree v. City of Birmingham, 381 So.2d 664,666 (Ala.Crim.App. 1980).
Rule 616, Ala.R.Evid., provides that "[a] party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case." Generally, this rule permits cross-examination, and the introduction of independent evidence, regarding statements, acts, or relationships indicating bias or prejudice, including arrests, indictments, and pending *Page 39 
charges that have not resulted in convictions even though such "bad acts" are generally inadmissible under Rules 608 and 609, Ala.R.Evid. See, e.g., C. Gamble, McElroy's Alabama Evidence, § 149.01(8)(a) (5th ed. 1996). However, the arrests, indictments or pending charges must have a tendency to show bias or prejudice on the part of the witness in order to be admissible.
Here, there is nothing in the record to suggest that the pending charges against Powell would have biased him in favor of the State. As the State correctly points out in its brief to this court, the record suggests that Powell's testimony at trial was substantially the same as the statement he gave police shortly after Johnson's body was found; this statement was made before the charges were brought against Powell in Wilcox County. Furthermore, although "[i]t is always permissible to cross-examine a witness to ascertain his interest, bias, prejudice or partiality concerning the matters about which he is testifying . . . [t]he fact that a witness has merely been indicted for an offense unrelated to the crime charged against the accused is not such a bias-creating fact."Woodard v. State, 489 So.2d 1, 2 (Ala.Crim.App. 1986). Only where "`the offenses are factually related or where the particular facts furnish a reasonable inference of interest or bias" is the fact that a witness has charges pending a proper subject of cross-examination. Beavers v. State,497 So.2d 612, 617 (Ala.Crim.App. 1986), quoting Woodward, 489 So.2d at 2. See also Baker v. State, 568 So.2d 374 (Ala.Crim.App. 1990); and Moodyv. State, 495 So.2d 104 (Ala.Crim.App.), cert. denied, 495 So.2d 110
(Ala. 1986). Here, the appellant has failed to show that the charges pending against Powell were "factually related" to the charge against the appellant, nor has he pointed to facts furnishing a reasonable inference of Powell's bias in favor of the State. Finally, there is absolutely no evidence of any agreement between the State and Powell pursuant to which Powell would testify at the appellant's trial in exchange for leniency with regard to the charges pending against him, and the prosecutor asserted at trial that there was, in fact, no such agreement. Accordingly, we hold that the trial court did not err in limiting the appellant's cross-examination of Powell regarding unrelated pending charges against him.
 VI.
The appellant contends that the trial court's instruction to the jury on reasonable doubt violated the principles of Cage v. Louisiana,498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In its oral charge, the trial court instructed the jury on reasonable doubt as follows:
 "Now in this case, as I said, the burden of proving that the defendant is guilty as charged rests upon the State. And before a conviction can be had in this case, the State must satisfy each and every member of the jury of the defendant's guilt. And unless the State satisfies you of the defendant's guilt beyond a reasonable doubt, then he is entitled to an acquittal. The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. But it may help you some to say that the doubt which would justify an acquittal must be a doubt for which you can assign a reason. It's not a mere guess or surmise or whim. It is not a forced or capacious [sic] doubt. Ladies and gentlemen of the jury, I charge you if you have a reasonable doubt of the defendant's guilt growing out of the evidence or any part of the evidence or lack thereof, you should acquit him. If, after considering all of the evidence in this *Page 40 
case, you have an abiding conviction of the truth of the charge, you are convinced beyond a reasonable doubt, and it would be your duty to convict the defendant.
 "The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from all or any part of the evidence or from the lack of the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair-minded and conscientious men and women would entertain under all of the circumstances. Now, you will observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond all reasonable doubt. If, after comparing and considering all of the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction of the defendant's guilt, then you are not convinced beyond a reasonable doubt, and the defendant would be entitled to an acquittal."
(R. 1091-92.) (Emphasis added to the phrase complained of by the appellant.) The appellant's counsel objected to the court's use of the phrase "reasonably substantial doubt" because, he said, the use of that phrase misstated and lessened the prosecution's burden of proof. The trial court overruled the objection.
It is well settled that "[t]he Due Process Clause of the Fourteenth Amendment `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" Knotts v. State, 686 So.2d 431, 459
(Ala.Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App. 1995), aff'd, 686 So.2d 486 (Ala. 1996), cert. denied, 520 U.S. 1199,117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), quoting In re Winship, 397 U.S. 358,364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the United States Supreme Court held that an instruction that equated "reasonable doubt" with "grave uncertainty," and "actual substantial doubt" and stated that what was required to convict was a "moral certainty," could have led a reasonable juror to interpret the instruction to allow a finding of guilt based on a lesser degree of proof than that required by the Due Process Clause. Subsequently, in Victor v.Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), "the Court `made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.'"Knotts, 686 So.2d at 459, quoting Victor, 511 U.S. at 6, 114 S.Ct. 1239
at 1243, quoting, in turn, Estelle v. McGuire, 502 U.S. 62, 72-73,112 S.Ct. 475, 482, 116 L.Ed.2d 385, n. 4 (1991). The constitutional question is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet theWinship standard." Victor, 511 U.S. at 6, 114 S.Ct. at 1243. In addition, the Supreme Court made it clear in Victor "that, while it did not condone the use of the Cage terminology in reasonable doubt instructions, the use of such terminology does not automatically render instructions unconstitutional if `"taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury."'"Lawhorn v. State, 756 So.2d 971, 985 (Ala.Crim.App. 1999), quotingVictor, 511 U.S. at 22, 114 S.Ct. at 1251, quoting, in turn, Holland v.United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150
(1954). See also Taylor v. State, 666 So.2d 36, 56 (Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120,116 S.Ct. 928, *Page 41 133 L.Ed.2d 856 (1996) ("`Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error.'"); and Sockwell v. State, 675 So.2d 4, 23 (Ala.Crim.App. 1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838,117 S.Ct. 115, 136 L.Ed.2d 67 (1996) ("It was the use of all three phrases inconjunction with each other that the Supreme Court determined was unconstitutional in Cage." (Emphasis added.)). Thus, in reviewing the reasonable-doubt instruction in this case, we do so in the context of the trial court's charge as a whole; as long as the concept of "reasonable doubt" was correctly conveyed to the jury, we will not find error. See, e.g., Knotts, supra.
Here, the trial court's charge, as a whole, correctly conveyed the concept of reasonable doubt to the jury; it did not lessen the State's burden of proof. The trial court's mere use of the phrase "reasonably substantial doubt" cannot be equated with the instruction condemned inCage, where the reasonable-doubt instruction contained the phrase "actual substantial doubt" as well as the phrases "grave uncertainty" and "moral certainty." See, e.g., Dobyne v. State, 672 So.2d 1319 (Ala.Crim.App.), opinion after remand, 672 So.2d 1353 (Ala.Crim.App. 1994), aff'd,672 So.2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571,134 L.Ed.2d 670 (1996) (upholding a charge using the phrase "reasonably substantial doubt" because it "contained none of the terms that the United States Supreme Court found questionable in Victor and reversible in Cage"). The reasonable-doubt instruction in this case was not misleading or confusing, and there was no reasonable likelihood that the jury applied the instruction in an unconstitutional manner. Accordingly, we find no error as to this claim.
 VII.
The appellant contends that the trial court erred in refusing to instruct the jury on complicity, under which theory the appellant was an accomplice, rather than the principal, in the commission of the crime. The appellant argues that he was entitled to such an instruction because, he says, "[t]he evidence could have supported a defense argument that although appellant Reeves had killed Johnson, he did not rob him." (Appellant's brief to this court, p. 37.) In refusing to give the complicity instruction requested by the appellant, the trial court stated that the instruction would be "misleading to the jury and not a proper statement of the law for these particular facts." (R. 1041.)
"`A trial court has broad discretion in formulating its jury instructions, provid[ed] they are an accurate reflection of the law and facts of the case.'" Hemphill v. State, 669 So.2d 1020, 1021
(Ala.Crim.App. 1995), quoting Coon v. State, 494 So.2d 184
(Ala.Crim.App. 1986). Although it is well settled that "[a] defendant is entitled to have the trial court instruct the jury on his theory of defense," Padgett v. State, 668 So.2d 78, 85 (Ala.Crim.App.), cert. denied, 668 So.2d 88 (Ala. 1995), it is equally well established that "[t]he trial judge may refuse to give a requested jury charge when the charge is either fairly and substantially covered by the trial judge's oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law." Harris v. State, 794 So.2d 1214, 1220
(Ala.Crim.App. 2000).
Here, there was no evidence to support a charge on complicity based on a theory that the appellant was an accomplice rather than the principal in the commission of the crime. The State's theory of the case was that the appellant was the *Page 42 
actual perpetrator of both the murder and the robbery of Johnson. The State presented evidence showing that on the afternoon of November 27, 1996, the appellant, his brother Julius, and Brenda Suttles met and planned a robbery they intended to commit on that day; that, later that day, when the vehicle they were riding in broke down and Johnson offered to tow them back to Selma, Julius told the appellant and Brenda Suttles that Johnson was to be their robbery victim; that the appellant subsequently shot Johnson and then told Julius and Suttles to search Johnson's pockets for money; and that the appellant later divided the money they had taken from Johnson among himself, Julius, and Suttles. There was simply no theory of the evidence from which a reasonable jury could have concluded that the appellant was "merely" an accomplice in Johnson's murder and robbery. The complicity instruction requested by the appellant would have been misleading and confusing, and the trial court properly refused to give it.
Moreover, even if some evidence had been presented to support a theory of complicity, we fail to see any harm to the appellant from the trial court's refusal of the appellant's requested charge. The distinction between a principal and an accomplice has been abolished in Alabama; accomplices are considered as guilty as principals and may be punished the same as principals. Even if evidence had been presented to support a theory that the appellant was an accomplice rather than the principal actor in the murder, the appellant still could have been convicted of capital murder and sentenced to death. In fact, it is arguable that the complicity instruction requested by the appellant would have increased the likelihood of the appellant's being convicted of capital murder because it would have allowed the jury to find him guilty of that offense either as an accomplice or as a principal. Accordingly, there was no reversible error in the trial court's refusal to give the appellant's requested instruction on complicity.
 VIII.
The appellant also contends that the trial court erred in refusing to instruct the jury on "robbery [as an] afterthought." At trial, the appellant requested several instructions relating to the general principle of law that robbery as a mere afterthought and unrelated to the murder cannot sustain a conviction for capital murder. However, the trial court refused to give the instructions requested by the appellant, finding that it was sufficient to give jurors the pattern jury charge on capital murder because the pattern charge adequately conveyed the principle that it was necessary for the murder to have occurred "during" a robbery in order to sustain a conviction for capital murder.
In Freeman v. State, 776 So.2d 160 (Ala.Crim.App. 1999), aff'd,776 So.2d 203 (Ala. 2000), we stated the following regarding robbery as an "afterthought":
 "`The capital crime of the intentional killing of the victim during a robbery or an attempted robbery is a single offense beginning with the act of robbing or attempting to rob and culminating with the intentional killing of the victim. The offense consists of two elements, robbing and intentionally killing. Davis v. State, 536 So.2d 110 (Ala.Crim.App. 1987), aff'd, 536 So.2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Magwood v. State, 494 So.2d 124 (Ala.Crim.App. 1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
 "`"As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), `the fact that the *Page 43 
victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713 (Ala.Crim.App. 1978), aff'd in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v. State, 451 So.2d 368, 372 (Ala.Crim.App. 1984). To sustain any other position `would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' Thomas v. State, 460 So.2d 207, 212, (Ala.Crim.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
 "`"Although a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, [382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980)]; O'Pry v. State, [ 642 S.W.2d 748 (Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379
(Ala.Crim.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. [at] 550, 142 So.2d [at] 871 (1962). The defendant's intent to rob the victim can be inferred where `the intervening time, if any, between the killing and robbery was part of a continuous chain of events.' Thomas v. State, 460 So.2d at 212. . . . See also Cobern v. State; Crowe v. State; Bufford v. State; Clements v. State."'
 "Bush v. State, 695 So.2d 70, 118-19 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala.), 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting Hallford v. State, 548 So.2d 526, 534-35 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), quoting in turn Connolly v. State, 500 So.2d 57, 63 (Ala.Crim.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986)."
776 So.2d at 190 — 91. The Alabama Supreme Court has stated that "`[e]ven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.'" Ex parte Roberts,735 So.2d 1270, 1277 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346,145 L.Ed.2d 271 (1999), quoting Johnson v. State, 479 So.2d 1377, 1380
(Ala.Crim.App. 1985), and citing Clark v. State, 451 So.2d 368
(Ala.Crim.App.), cert. denied, 451 So.2d 368 (Ala. 1984).
Here, the trial court properly instructed the jury that in order to convict the appellant of capital murder, the State had to prove that the murder was committed "during the robbery." (R. 1094.) The trial court defined "during the robbery" as "in the course of the commission of or in connection with the commission of the robbery." (R. 1094.) With these instructions, the trial court adequately conveyed to the jury the facts under which it could, and could not, find the appellant guilty of capital murder.
As we stated in Woods v. State, 789 So.2d 896 (Ala.Crim.App. 1999):
 "Although this court has held that the taking of property as a mere afterthought to a murder will not support a *Page 44 
capital murder conviction under § 13A-5-40(a)(2), Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980), we have not held that the trial court must use the term `mere afterthought' in its jury instructions on robbery-murder. The trial court more than adequately instructed the jury that the robbery had to occur `during' the course of the murder."
789 So.2d at 932. See also Roberts v. State, 735 So.2d 1244
(Ala.Crim.App. 1997), aff'd 735 So.2d 1270 (Ala.), cert. denied,538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999); Ex parte Windsor,683 So.2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438,137 L.Ed.2d 545 (1997); Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App. 1992), aff'd, 627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012,114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).
Moreover, there was no evidence that the robbery of Johnson was an "afterthought." Rather, as noted in Part VII of this opinion, all the evidence showed that the appellant, his brother Julius, and Brenda Suttles set out on November 27, 1996, to rob someone. They openly discussed driving to White Hall to rob a drug dealer there; however, after the vehicle they were riding in broke down, they decided to rob Johnson, who had stopped to help and to tow them back to Selma. Intending to make Johnson the robbery victim, the appellant got into the rear bed of Johnson's pickup truck with a shotgun. Later, after they pulled into Crockett's Alley, the appellant shot Johnson and then told Julius and Suttles to search Johnson's pockets for money. The appellant subsequently divided the money taken from Johnson among himself, Julius, and Suttles and was heard to brag that he had "made the money." Clearly, the robbery was not a "mere afterthought," but instead was, with the murder, part of one "continuous chain of events."
Because there was no evidence to support the theory that the robbery was a mere afterthought, unrelated to Johnson's murder, and because the jury was properly instructed that it could convict the appellant only if it found that the murder occurred "during" a robbery, the trial court did not err in denying the appellant's request for a specific instruction on "robbery [as an] afterthought."
 IX.
The appellant contends that the prosecutor engaged in misconduct during both the guilt phase and the sentencing phase of the trial.
Initially, we note that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract."Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand,625 So.2d 1141 (Ala.Crim.App. 1992), rev'd on other grounds, 625 So.2d 1146
(Ala. 1993). See also Henderson v. State, 583 So.2d 276, 304
(Ala.Crim.App. 1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied,503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v.Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144
(1986), quoting, in turn, Donnelly v. DeChristoforo, 416 U.S. 637,94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "A prosecutor's statement must be viewed in the context of all of the *Page 45 
evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App. 1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939,120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict."Bankhead, 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCulloughv. State, 357 So.2d 397, 399 (Ala.Crim.App. 1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105.
 A.
During closing arguments at the guilt phase of the trial, the appellant's counsel argued to the jury that, although the appellant had shot and killed Johnson, the robbery was a "mere afterthought." In the rebuttal closing argument that followed, the prosecutor made these remarks:
 "They are up here telling you that this is not a capital murder case because they didn't go down and say, `Oh, yeah, I think he cashed his paycheck today. Oh, yeah, he has probably got a lot of money.' The deal was they set out that morning to rob somebody. They rode all over the town here trying to find somebody to rob. And when the good Samaritan came along and pulled them and their broke-down car back to Selma, they decided they would pay him off with the ring and take it back and whatever else he had.
 "Y'all, the defense is designed and charged with defending this man any way he can."
(R. 1079-80.) The appellant's counsel objected to the prosecutor's remarks, arguing that they suggested to the jury that the only reason defense counsel was making an argument on the appellant's behalf was that he had been appointed to represent the appellant and was required to make such an argument. The trial court overruled the objection, and the prosecutor continued rebuttal closing argument as follows:
 "Within the rules of law and evidence, it is our job to present the evidence against this man. Their argument is that this is no robbery. It didn't occur. If you blow a man's head off and you go through his pockets and take his money, that's robbery. It's no joke when they say if it walks like a duck and talks like a duck and looks like a duck, it's a duck. I just don't understand that argument. I don't understand the logic of it, and I don't understand the meaning of it. I don't think it fits under these facts."
(R. 1080-81.)
On appeal, the appellant argues, for the first time, that the prosecutor's remarks "improperly spotlight[ed] the defense strategy." (Appellant's brief to this court, p. 52.) Because this particular argument was not presented to the trial court, we review the appellant's claim only for plain error. See Rule 45A, Ala.R.App.P.
The prosecution is entitled to "spotlight the defense's strategy," and a prosecutor's remarks during closing argument pointing out the flaws in the defense's theory of the case do not constitute improper argument. "During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So.2d 1087,1100 (Ala.Crim.App. 1987) (citation omitted), rev'd on other grounds,523 So.2d 1118 *Page 46 
(Ala. 1988). The remarks complained of by the appellant were part of the prosecutor's legitimate argument that the evidence did not support the defense's theory that the robbery of Johnson was a "mere afterthought." We find no error here, plain or otherwise.
 B.
During closing arguments at the sentencing phase of the trial, the prosecutor commented to the jury as follows:
 "Now you are called upon to make a tough decision. You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson. Death or life in prison without parole. Who decided Willie Johnson's fate? Did he have the opportunity to have a five-or six-day proceeding?"
(R. 1191.)
On appeal, the appellant contends that by asking the jury to consider whether the victim Johnson had been afforded a five-or six-day trial (as the appellant was being afforded) before his fate was decided, the prosecutor improperly "inject[ed] an extraneous factor other than the `character and record of the individual offender and the circumstances of the particular offense,' . . . divert[ed] jurors from their primary responsibility . . . [and made it] possible that the death sentence recommended and imposed was the product of an arbitrary factor." (Appellant's brief to this court, p. 57, quoting, in part, Lockett v.Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).) At trial, the appellant did not object to the prosecutor's comments on this ground; therefore, we review this claim only for plain error. Rule 45A, Ala.R.App.P.
We have reviewed the complained-of comment, both in the context of the entire closing argument and in the context of the entire trial, and we find no error. See Jenkins v. State, 627 So.2d 1034, 1051 (Ala.Crim.App. 1992), aff'd, 627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012,114 S.Ct. 1388, 128 L.Ed.2d 63 (1994); Holladay v. State, 549 So.2d 122,131 (Ala.Crim.App. 1988), aff'd, 549 So.2d 135 (Ala.), cert. denied,493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). The prosecutor's comment would have been valued by the jury at its true worth — as having been uttered in the heat of debate — and could not be expected to have become a factor improperly influencing the jury's sentencing recommendation. See Duren v. State, 590 So.2d 360, 364
(Ala.Crim.App. 1990), aff'd, 590 So.2d 369 (Ala. 1991), cert. denied,503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). Moreover, the jury was properly instructed that the arguments of counsel were not evidence, and that its sentencing recommendation was not to be influenced by passion, prejudice, or any other arbitrary factor. The jury is presumed to follow the trial court's instructions. See Taylor v. State, 666 So.2d 36
(Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied,516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). We find no error, plain or otherwise, as to this claim.
 X.
The appellant contends that Alabama's capital sentencing scheme is unconstitutional because, he says, it "does not specify a measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty." (Appellant's brief to this court, p. 42.) According to the appellant, "the absence of a standard and the trial court's failure to so charge the jury" renders capital sentencing in Alabama unconstitutional. (Appellant's brief to this court, p. 42.) Because the appellant is *Page 47 
presenting this claim for the first time on appeal, we review it under the plain-error rule. Rule 45A, Ala.R.App.P.
In Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330,101 L.Ed.2d 155 (1988), the United States Supreme Court rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." "Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer." Harris v.Alabama, 513 U.S. 504, 511, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004
(1995).
The jury in this case was properly instructed by the trial court as to weighing the aggravating circumstances and the mitigating circumstances. See Tyson v. State, 784 So.2d 328 (Ala.Crim.App. 2000). Accordingly, we find no error, much less plain error, as to this claim.
 XI.
The appellant contends that the trial court "erred in failing to consider [the appellant's] low level of intelligence as a mitigating circumstance." (Appellant's brief to this court, p. 57.) Although in his motion for a new trial the appellant generally argued that the trial court had "failed to properly consider mitigating circumstances in this case" (R. 231), he did not present the trial court with the specific claim he now raises on appeal; therefore, we review the claim under the plain-error rule. See Rule 45A, Ala.R.App.P. We find no error, plain or otherwise.
 "In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process."
Ex parte Hart, 612 So.2d 536, 542 (Ala. 1992), cert. denied, 508 U.S. 953,113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). "`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'" Ex parte Slaton, 680 So.2d 909, 924 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680
(1997), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App. 1992), rev'd,625 So.2d 1146 (Ala. 1993). "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." Harrell v. State, 470 So.2d 1303, 1308
(Ala.Crim.App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied,474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
 "`A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration *Page 48 
of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala. 1992); Haney v. State, 603 So.2d 368
(Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253
(Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36
(Ala.Cr.App. 1985), aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).'"
Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App. 1999), quotingWilliams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App. 1996), aff'd,710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325,141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence. See, e.g., Ingram v.State, 779 So.2d 1225 (Ala.Crim.App. 1999).
The sentencing order in this case shows that the trial court considered all of the mitigating evidence offered by the appellant. The record reflects that during the sentencing phase of the trial, the trial court did not limit or restrict the appellant in any way as to the evidence he presented or the arguments that he made. In its sentencing order, the trial court treated each statutory mitigating circumstance listed in § 13A-5-51, Ala. Code 1975; determined the existence or nonexistence of each circumstance; and made specific findings of fact regarding each circumstance. Although the trial court did not list and make findings as to each nonstatutory mitigating circumstance offered by the appellant, it specifically found two nonstatutory mitigating circumstances to exist: (1) that the appellant "grew up in a poor home environment and . . . lacked appropriate developmental resources in growing up"; and (2) that the appellant, "when placed in a structured environment, respond[ed] positively." (C. 238.) (The trial court noted, however, that the evidence relating to the second of these nonstatutory mitigating circumstances also suggested that the appellant had "the ability to conduct himself properly and not engage in criminal conduct, [but instead] voluntarily chose that course of conduct.") Further, in that portion of the sentencing order where the trial court discussed its reasoning for not finding the existence of the statutory mitigating circumstance that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," the trial court expressly indicated that it had considered the appellant's "low intellectual level." (C. 237.) Also, during the sentencing phase of the trial, the trial court specifically instructed the jury that it must consider as a mitigating circumstance the appellant's proffered evidence of his "borderline" intelligence. *Page 49 
(R. 1217.) Thus, we conclude that the trial court fully complied withLockett and its progeny and that it considered the evidence of the appellant's "borderline" intelligence offered by the appellant in mitigation.
We note that although there was evidence indicating that the appellant's overall IQ was 74, which would place the appellant in the "borderline range of intelligence," the appellant presented no evidence that he was mentally retarded or that he suffered from any major psychiatric disorder. Clearly, the trial court considered the appellant's proffered evidence of his low intellectual level, but concluded that this evidence did not rise to the level of a mitigating circumstance. The trial court's findings in this regard are supported by the record.
Because it is clear from a review of the entire record that the trial court understood its duty to consider all the evidence presented by the appellant in mitigation, that the trial court did in fact consider all such evidence, and that the trial court's findings are supported by the evidence, we find no error, plain or otherwise, in the trial court's findings regarding the nonstatutory mitigating circumstances.
 XII.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to the appellant's capital-murder conviction and the death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or the sentencing phase of the trial.
We have reviewed the appellant's sentence in accordance with §13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving the appellant's capital-murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b), Ala. Code 1975, requires that, in determining whether death is the proper sentence, we assess (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury found the appellant guilty of the capital offense charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended, by a vote of 10-2, that the appellant be sentenced to death.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence the appellant to *Page 50 
life imprisonment without parole or to death, as the jury recommended. The trial court ordered and received a written presentence-investigation report, as required by § 13A-5-47(b). At the conclusion of the hearing, the trial court entered specific written findings concerning the aggravating circumstances enumerated in § 13A-5-49, Ala. Code 1975, the mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under §13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and the appellant's participation in the offense.
In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murder was committed while the appellant was engaged in the commission of a robbery, see §13A-5-49(4), Ala. Code 1975. The trial court found the existence of two statutory mitigating circumstances: (1) that the appellant had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975; and (2) that the appellant was 19 years old at the time of the offense, see § 13A-5-51(7), Ala. Code 1975.[1] The trial court also heard testimony regarding the appellant's character and record and any of the circumstances of the offense that the appellant offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975. In this regard, the trial court found that the following evidence presented by the appellant constituted nonstatutory mitigation: (1) evidence that the appellant "grew up in a poor home environment and that he lacked appropriate developmental resources in growing up;" and (2) evidence that "when placed in a structured environment, [the appellant] responds well." (C. 238.)
The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced the appellant to death. The trial court's findings concerning the aggravating circumstance and the mitigating circumstances are supported by the evidence.
The appellant was convicted of the offense of murder committed during the course of a robbery. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(2), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. E.g., Hardy v. State, 804 So.2d 247 (Ala.Crim.App. 1999); Clemonsv. State, 720 So.2d 961 (Ala.Crim.App. 1996), aff'd, 720 So.2d 985 (Ala. 1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906
(1999); Williams v. State, 710 So.2d 1276 (Ala.Crim.App. 1996), aff'd,710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325,141 L.Ed.2d 699 (1998); McNair v. State, 706 So.2d 828 (Ala.Crim.App. 1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654
(1998); Henderson v. State, 583 So.2d 276 (Ala.Crim.App. 1990), aff'd,583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268,117 L.Ed.2d 496 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 *Page 51 
(1991); Brownlee v. State, 545 So.2d 151 (Ala.Crim.App. 1988), aff'd,545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208,107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945,110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110
(Ala.Crim.App. 1987), aff'd, 536 So.2d 118 (Ala. 1988), cert. denied,490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); and Cochran v.State, 500 So.2d 1161, (Ala.Crim.App. 1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188
(Ala.Crim.App.), aff'd, 500 So.2d 1064 (Ala. 1986), cert. denied,481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987). In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of murder made capital because it was committed during the commission of a robbery. McNair, supra.
After carefully reviewing the record of the guilt phase and the sentencing phase of the appellant's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances and that death is the appropriate sentence in this case. Considering the appellant and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated above, the appellant's conviction and the sentence of death are affirmed.
APPLICATION FOR REHEARING DENIED; OPINION OF AUGUST 25, 2000, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
McMillan, Cobb, Baschab, and Fry, JJ., concur.
[1] The record reflects that the appellant was actually 18 years old at the time of the offense — the offense was committed two weeks before his 19th birthday. The appellant was 20 years old at the time of trial. *Page 505